AUTO CLUB INSURANCE ASSOCIATION v
FREDERICK & HERRUD, INC (AFTER REMAND)

AUTO CLUB INSURANCE ASSOCIATION v
PENTWATER WIRE PRODUCTS, INC

Docket Nos. 93816, 93925. Argued March 3, 1993 (Calendar Nos. 7-8).
Decided August 31, 1993. Rehearings denied 444 Mich 1202.
Certiorari denied in *Pentwater* by the Supreme Court of the
United States on March 21, 1994, — US — (1994).

The Auto Club Insurance Association brought an action in the
Oakland Circuit Court against Frederick & Herrud, Inc., for
recovery of no-fault benefits paid to Frederick & Herrud employees or their dependents, on the basis of coördination of
benefits and related subrogation clauses in its contracts and a
coördination of benefits clause in the defendant's self-funded
employee welfare benefits plan established pursuant to the
federal Employee Retirement Insurance Security Act, 29 USC
1001 *et seq.* The court, Frederick C. Ziem, J., ordered the
defendant to pay ACIA half the benefits owed to the insureds.
The Court of Appeals, DANHOF, C.J., and BURNS and V. J.
BRENNAN, JJ., reversed, concluding that a no-fault insurer was
required only to provide secondary coverage in cases involving
competing coördination of benefits clauses, and remanded the
case to the circuit court (Docket No. 79289).

On remand, the circuit court entered judgment for the plaintiff. The Court of Appeals, GRIBBS, P.J., and MAHER and J. L.
BANKS, JJ., affirmed, holding on the basis of *Northern Group
Services, Inc v Auto-Owners Ins Co,* 833 F2d 85 (CA 6, 1987),
that the Michigan coördination of benefits rule, MCL
500.3109a; MSA 24.13109(1), was not preëmpted by the ERISA
(Docket No. 96693). The Michigan Supreme Court denied leave
to appeal. 433 Mich 902 (1989). In lieu of plenary consideration,
the United States Supreme Court vacated the judgment of the
Court of Appeals and remanded for further proceedings in light
of *FMC Corp v Holliday,* 498 US 52 (1990). On remand, the

REFERENCES

Am Jur 2d, Pensions and Retirement Funds §§ 343-494.

See ALR Index under Employee Retirement Income Security Act;
Labor and Employment; Subrogation.

Court of Appeals, GRIBBS, P.J., and DOCTOROFF and REILLY, JJ., reversed, holding that MCL 500.3109a; MSA 24.13109(1) is preëmpted by the ERISA (Docket No. 135974). ACIA appeals.

The ACIA brought an action in the Oceana Circuit Court against Pentwater Wire Products, Inc., seeking recoupment of no-fault benefits paid to the wife of a Pentwater employee, on the basis of coördination of benefits clauses in its contract and in Pentwater's employee health benefits plan established pursuant to the ERISA. A gap in coverage in the Pentwater plan was filled by "stop-loss" insurance.

Pentwater sought to remove the case to the United States District Court for the Western District of Michigan on the ground that the ERISA preëmpted the plaintiff's claim. Following the decision in *Northern Group Services*, the federal district court remanded to the Oceana Circuit Court, holding that in the absence of preëmption, ACIA had pleaded a state cause of action only.

On remand, the court, Terrence R. Thomas, J., granted partial summary disposition for the plaintiff. The Court of Appeals, DANHOF, C.J., and DOCTOROFF and BRENNAN, JJ., reversed in an unpublished opinion per curiam, holding on the basis of *FMC Corp* that MCL 500.3109a; MSA 24.13109(1) was preëmpted by the ERISA (Docket No. 126174). ACIA appeals.

In a unanimous opinion by Justice RILEY, the Supreme Court *held:*

The ERISA issues in these cases were preserved for review. Subrogation of claims is permitted under the ERISA. A coördination of benefits clause in an ERISA plan must be given its plain meaning despite the existence of a similar clause in a no-fault insurance policy. The existence of stop-loss insurance is irrelevant to the issue of preëmption in these cases.

1. Federal case law is split regarding whether subrogation of claims is permitted under the ERISA. However, the line of federal cases permitting subrogation comport with the federal policy of benefiting employees and represent the better approach as a matter of public policy. Subrogation ensures the rapid payment of benefits to employees, and benefits Michigan's citizens. Thus, a subrogee, such as ACIA in these cases, may stand in the shoes of a subrogor ERISA plan member.

2. The ERISA issues in these cases were preserved for review by the Supreme Court. The ERISA implications were considered after the plaintiffs received favorable judgments, and, accordingly, the plaintiffs were not required to take any steps to preserve the issues. Further, the federal courts have indicated a clear preference for consideration of ERISA issues despite a

party's failure to frame them at the commencement of proceedings. In addition, the federal issues in *Frederick* were incorporated, directly or indirectly, by the United States Supreme Court in requiring reconsideration in light of *FMC Corp.* Finally, any delay in the treatment of the ERISA issues is directly attributable to recent development in the federal courts, not to any dilatory practice by the parties.

3. Presupposing preëmption of state law by the ERISA, a coördination of benefits clause in an ERISA policy must be given its clear meaning without the creation of any artificial conflict with MCL 500.3109a; MSA 24.13109(1). Because in these cases each plan provides that no-fault insurance is primary where the potential for duplication of benefits occurs, the terms of the ERISA plans control, making the no-fault insurer, ACIA, primarily liable for the benefits at issue. Although the Michigan statute purports to regulate insurance and not ERISA plans, it would have a direct effect on the administration of the plans in these cases because it virtually would write a primacy of coverage clause into the plans. This is the type of state regulation that federal case law forbids. Moreover, the federal policy furthers the state interest of fostering the existence of ERISA health and welfare benefits plans, especially in cases in which there is no no-fault or other insurance to provide benefits. Thus, MCL 500.3109a; MSA 24.13109(1) does not reach an ERISA plan with a coördination of benefits clause where that clause is unambiguous.

4. The existence of stop-loss insurance in *Pentwater* is irrelevant because any regulation would have a significant effect on the administration of the ERISA plans involved.

Affirmed.

191 Mich App 471; 479 NW2d 18 (1991) affirmed.

*Federal Kemper Ins Co v Health Ins Administration, Inc,* 424 Mich 537; 383 NW2d 590 (1986) overruled in part.

INSURANCE — NO-FAULT — ERISA — SUBROGATION.

A coördination of benefits clause in an ERISA plan must be given its plain meaning despite the existence of a similar clause in a no-fault insurance policy (29 USC 1001 *et seq.*; MCL 500.3109a; MSA 24.13109[1]).

*John Wesley Kline* (*Nancy L. Bosh,* of counsel), for the plaintiff in *Frederick & Herrud, Inc.*

*Brandt, Hanlon, Becker, Lanctot, McCutcheon,*

*Schoolmaster & Taylor* (by *David J. Lanctot*); *Gross & Nemeth,* of counsel (by *Paul L. Kaliszewski, James G. Gross,* and *Mary T. Nemeth*), for the plaintiff in *Pentwater Wire Products, Inc.*

*Finkel, Whitefield & Selik, P.C.* (by *Bradley T. Raymond*), for defendant Frederick & Herrud, Inc.

*Honigman, Miller, Schwartz & Cohen* (by *Stephen Wasinger* and *John Eggertsen*) for defendant Pentwater Wire Products, Inc.

RILEY, J. In this case, we are called upon to decide the primacy of insurance liability between plaintiff no-fault insurer and two different employee health benefit plans established by defendants pursuant to the Employee Retirement Insurance Security Act,[1] in which each contract with their insured contains unambiguous coördination-of-benefits (COB) clauses. Related questions are whether the ERISA permits subrogation of claims, whether the issue was properly preserved for this Court's review, and whether the existence of "stop-loss" insurance has any bearing on our determination of the first issue.

We hold that subrogation of claims is permitted under the ERISA. We also conclude that the ERISA issues were preserved for this Court's review. In addition, we find that the COB clause in an ERISA plan must be given its plain meaning despite the existence of a similar clause in a no-fault insurance policy as a matter of federal common law. Finally, we conclude that the existence of stop-loss insurance is irrelevant to the issue of preëmption under the facts of these cases. Thus, we affirm the opinions of the Court of Appeals.

[1] 29 USC 1001 *et seq.*

## I

### FACTS AND PROCEDURAL HISTORY

#### A

*AUTO CLUB v FREDERICK & HERRUD, INC*

Plaintiff Auto Club paid no-fault automobile accident benefits to seven of its insureds who worked for defendant Frederick & Herrud or who were dependents of Frederick & Herrud employees.[2] Pursuant to a COB clause[3] in its contract with the insureds and a related subrogation clause, plaintiff filed a complaint to recover its expenditures from defendant under the terms of defendant's self-funded employee welfare benefits plan (hereafter "Frederick plan") that also contains a COB clause.[4]

---

[2] At some time after proceedings were filed in this matter, the name of the company was changed to Thorn Apple Valley, Inc. The caption was changed to reflect the proper name of defendant by the United States Supreme Court in 498 US 996; 111 S Ct 552; 112 L Ed 2d 559 (1990). For purposes of consistency, defendant will be referred to as "Frederick & Herrud" or "defendant" except where its present name appears in an official citation.

[3] Auto Club's insurance policy provides in pertinent part:

> In consideration of the reduced premium for Personal Protection Insurance and a presumption that medical benefits are provided by another source, . . . under the Medical Benefits Coverage, sums paid or payable to or on behalf of the named insured . . . shall be reduced by any amount paid or payable under any . . . disability or hospitalization insurance, medical, surgical or hospital direct pay or reimbursement health care plan . . . .

The option of a lowered insurance premium for a policy providing for coördinated benefits is a mandatory feature of all no-fault automobile insurance policies issued in Michigan. See MCL 500.3109a; MSA 24.13109(1).

[4] Section twenty-one of defendant's plan provides:

> In addition to the benefits payable under this plan, sometimes an employee or dependent is entitled to benefits for the same hospital or medical expenses under the group fault or no-

In response to defendant's motion for summary disposition, the circuit court concluded that neither party was entitled to a judgment that the other was solely responsible for the benefits paid. Having determined that the competing COB clauses were unambiguous, the court entered a judgment ordering both parties to pay half the benefits owed to the insureds.

The Court of Appeals reversed the circuit court's summary judgment order concluding that the legislative intent behind MCL 500.3109a; MSA 24.13109(1) required that a no-fault insurer provide only secondary coverage in cases involving competing COB clauses. 145 Mich App 722, 728; 377 NW2d 902 (1985). The case was remanded to the circuit court for entry of an appropriate order.

Following remand, defendant retained the services of different counsel. Defendant moved for leave to file an amended answer and notice of affirmative defenses that, for the first time, asserted preëmption of any state law claims by the ERISA. The circuit court denied the motion to amend. Several months later, it entered an order denying defendant's motion for summary disposition for lack of subject matter jurisdiction and granted plaintiff's motion for entry of judgment.

Defendant appealed the denial of its motion to amend and its motion for summary disposition. The Court of Appeals affirmed the judgment on the basis of the holding of the United States Court of Appeals for the Sixth Circuit in *Northern Group Services, Inc v Auto Owners Ins Co*, 833

fault auto insurance, individual no fault auto insurance . . . . Should this type of duplication occur, the benefits under this plan will be co-ordinated so that the total benefits from all plans will not exceed the hospital or medical expenses actually incurred. In all cases employees with no-fault auto insurance coverage, the auto insurance carrier will be primary.

F2d 85 (CA 6, 1987), cert den 486 US 1017 (1988), which provided that the Michigan rule for coördination of benefits in MCL 500.3109a; MSA 24.13109(1) was *not* preëmpted by the ERISA. 175 Mich App 412, 417-419; 438 NW2d 320 (1989). This Court denied defendant's application for leave to appeal.[5]

Defendant sought a writ of certiorari in the United States Supreme Court.[6] In lieu of plenary consideration, the United States Supreme Court vacated the judgment of the Court of Appeals and remanded for further consideration in light of its recently decided *FMC Corp v Holliday,* 498 US 52; 111 S Ct 403; 112 L Ed 2d 356 (1990).

On remand, the Court of Appeals noted that *Northern Group Services, supra,* was effectively overruled by *FMC Corp.* 191 Mich App 471, 474; 479 NW2d 18 (1991). Accordingly, it ruled that the state regulation found in MCL 500.3109a; MSA 24.13109(1) is preëmpted by the ERISA and reversed the circuit court's judgment. *Id.* That defendant's health plan may have been partially insured was held to be immaterial because plaintiff failed to preserve the issue. *Id.* This Court granted plaintiff's application for leave to appeal for consideration with the companion case.[7]

**B**

*AUTO CLUB v PENTWATER WIRE PRODUCTS, INC*

Plaintiff Auto Club paid no-fault automobile accident benefits to its insured, Alice Guetzka.

[5] 433 Mich 902 (1989).

[6] See n 2.

[7] 441 Mich 878 (1992).

Pursuant to a COB clause[8] in the contract, together with its right of subrogation of the insured's claims, plaintiff filed a complaint against defendant, the ERISA health plan of her estranged husband's employer, seeking recoupment of $357,699 in benefits paid, together with roughly $150,000 in interest and attorney fees. The employee health benefits plan ("Pentwater plan") provided for payment of the first $14,000 of any valid claim in addition to any amounts over $1,000,000. The gap in coverage occasioned by these provisions was filled by "stop-loss" insurance.[9] The Pentwater plan also contains a COB clause.[10]

One month after the complaint was filed in a state court, defendant sought to remove the case to the United States District Court for the Western District of Michigan on the ground that the ERISA preëmpted plaintiff's claim. Shortly thereafter, the parties stipulated to an abeyance pending the

[8] The relevant provision states:

> If the Declaration Certificate shows Coordinated Medical Benefits, sums paid or payable to or for you or any relative shall be reduced by any amount paid or payable under any valid and collectible: individual, blanket or group disability or hospitalization insurance; medical, surgical or hospital direct pay or reimbursement health care plan; Workers' Compensation Law, disability law of a similar nature, or any other state or federal law; or car or premises insurance affording medical expense benefits.

[9] "Stop-loss" coverage consists of the purchase of insurance by a benefits plan to pay valid claims according to a plan's terms. A plan may be entirely self-funded or it may shift the risk of paying benefits to an insurance company by using funds allocated to the plan for payment of insurance premiums. In the instant case, the Pentwater plan bears the risk of employee claims up to the $14,000 figure and over $1,000,000.

[10] The clause provides:

> [N]o-fault Auto coverage is always considered to be the primary Plan, and This Plan shall be deemed to provide only "excess insurance."

decision of the United States Court of Appeals for the Sixth Circuit in *Northern Group Services, Inc v Auto Owners Ins Co, supra.* Following issuance of the decision in *Northern Group Services,* the district court remanded the case to the state court because "Auto Club [pleaded] a state law cause of action only" in the absence of preëmption.

On remand, the circuit court granted plaintiff's motion for summary disposition while denying defendant's motion. An order was entered on July 25, 1989, granting plaintiff's motion for partial summary judgment. On April 9, 1990, the circuit court entered an amended judgment in favor of plaintiff for $511,253.08. Defendant's motion for a new trial or relief from the judgment was denied on January 29, 1990.[11]

Defendant filed its claim of appeal after the United States Supreme Court decided *FMC Corp.* The Court of Appeals did, however, have the benefit of the *FMC Corp* holding because it had already been considered and adopted by another panel in the companion case.[12] Therefore, relying on this earlier precedent, the Court reversed, concluding that MCL 500.3109a; MSA 24.13109(1) was preëmpted by ERISA, that the existence of "stop-

[11] The brief in support of the motion appears to be the first time that the ERISA issue was squarely presented to the circuit court. Defendant asserted the following as its basis for the motion:

[I]n light of this new decision [*Northern Group Services, supra*], the defendant asserts that this court should reconsider its prior ruling on the parties' motions and, this court should find that *pursuant to the Liberty Mutual [Ins Group v Iron Workers Health Fund of Eastern Michigan,* 879 F2d 1384 (CA 6, 1989)] decision that Section 3109a is preëmpted, and therefore, the Auto Club Insurance Association policy is primary and there is no cause of action against the defendant.* [Emphasis added.]

[12] See *Auto Club Ins Ass'n v Frederick & Herrud, Inc (On Remand), supra.*

loss" insurance was irrelevant to the issue of preëmption, and that plaintiff failed to preserve its argument that ERISA preëmption required consideration of the federal common law on the conflicting clauses issue rather than dismissal of the action. Unpublished opinion per curiam of the Court of Appeals, decided January 6, 1992 (Docket No. 126174). With the assistance of new counsel, plaintiff moved for a rehearing that was denied in an order entered April 2, 1992. This Court granted plaintiff's application for leave to appeal for consideration of the ERISA issues together with the companion case.[13]

C

Before turning to the substantive issues, a brief overview of how the issues have reached this Court is in order. It would be fair to say that the primary issue regarding the conflicting coördination-of-benefits clauses has only recently been defined by a flurry of federal cases. Originally, plaintiff filed complaints for the recoupment of its expenditures alleging state law claims surrounding the interpretation of its COB clauses and its rights under a subrogation theory. In 1985, our Court of Appeals held that a no-fault insurer was to be considered secondarily liable to any health and accident insurer where both insurers' contracts with an insured contained COB clauses. *Frederick & Herrud,* 145 Mich App 727-731.[14]

In 1985, the federal courts also began to focus

---

[13] 441 Mich 879 (1992).

[14] This Court adopted the reasoning of the Court of Appeals in *Federal Kemper Ins, Inc v Health Ins Administration, Inc,* 424 Mich 537; 383 NW2d 590 (1986). In *Kemper,* we noted the existence of a majority rule on the issue, which attempts to reconcile the conflict by discerning the parties' intent, and a minority rule considering the conflicting clauses "mutually repugnant" and assigns pro-rata liability. *Id.* at 542-543. Notwithstanding the existence of these views, the

their attention on the ERISA preëmption problem in cases involving health and welfare benefits plans.[15] And, following the landmark decision in *FMC Corp,* the issues implicated here reached the Sixth Circuit in several cases. In *Auto Club Ins Ass'n v Health & Welfare Plans, Inc,* 961 F2d 588 (CA 6, 1992), the court determined that ERISA preëmption, a point made clear in *FMC Corp,* did not ipso facto render the COB clause in a no-fault insurance policy void where it conflicted with a similar clause in an ERISA health plan. The case was remanded to the district court to determine "how a court should resolve a conflict between two (presumably) unambiguous, seemingly valid, and irreconcilable coördination of benefits clauses, one contained in an ERISA plan and one in a non-ERISA policy." *Id.* at 594.[16] In *Lincoln Mutual Casualty Co v Lectron Products, Inc, Employee Health Benefit Plan,* 970 F2d 206, 211 (CA 6, 1992), the Sixth Circuit concluded:

> As we noted in *Auto Club,* the fact that § 3109a is preëmpted by ERISA does not necessarily render Lincoln's COB clause void, nor does it necessarily mean that the Plan's terms prevail. We have before us, then, two valid, unambiguous, and irreconcilable clauses. Because no federal statutory law addresses the issue of how to resolve the

Court determined that the legislative intent behind MCL 500.3109a; MSA 24.13109(1) required the conclusion that the health insurer was primarily liable in this situation.

> We conclude, therefore, that defendant health insurer is primarily liable. Giving effect to plaintiff's coördinated benefits provision furthers the purposes of § 3109a to contain both auto insurance costs and health care costs, while eliminating duplicative recovery. [*Id.* at 551.]

[15] See *Metropolitan Life Ins Co v Massachusetts,* 471 US 724; 105 S Ct 2380; 85 L Ed 2d 728 (1985), discussed *infra* at 384-386.

[16] We are told that the parties to this case settled the controversy without opinion of the district court.

conflict between the clauses, this case must be resolved by applying *federal common law.* [Emphasis added, citations omitted.][17]

On remand in *Lincoln Mutual,* the district court concluded that Michigan's interpretation of MCL 500.3109a; MSA 24.13109(1) would impermissibly subject ERISA health plans to variable state regulation. 823 F Supp 1385, 1394 (ED Mich, 1993). Citing several unpublished Sixth Circuit cases involving ERISA issues other than the conflict at issue here, the court held that "the straightforward language of the ERISA policy provision . . . must be given its natural meaning." *Id.* at 1392. The court further stated that, pursuant to the clear import of *FMC Corp,* the ERISA health plan was not an insurance company subject to regulation by state law. *Id.* at 1392, n 9.[18]

Two months earlier, the United States District Court for the Western District of Michigan had

---

[17] In *Northern Group Services, supra,* the Sixth Circuit concluded that MCL 500.3109a; MSA 24.13109(1) was the type of state regulation that survived ERISA preëmption. 833 F2d 95. *Northern Group Services* is, however, a pre-*FMC Corp* case and is accordingly of questionable import. In several other cases, the federal courts refrained from deciding the conflict by characterizing the clauses in ERISA plans as exclusions rather than as COB clauses. The exclusionary language in the ERISA plans was then given its plain meaning, which removed any conflict with a COB clause in a no-fault insurance policy. See, e.g., *Liberty Mutual Ins Group v Iron Workers Health Fund of Eastern Michigan,* n 11 *supra; Allstate Ins Co v Detroit Millmen's Health & Welfare Fund,* 729 F Supp 1142 (ED Mich, 1990); *Transamerica Ins Co of North America v Peerless Industries (MASCO),* 698 F Supp 1350 (WD Mich, 1988). See also *Transamerica Ins Co of America v IBA Health & Life Assurance Co,* 190 Mich App 190; 475 NW2d 431 (1991) ("[W]here a clear and unambiguous limitation of benefits for injuries related to auto accidents appears in a health and accident insurance policy . . . such limitation is a valid exclusionary provision").

[18] The district court's strict interpretation of the ERISA plan's terms included emphasis on the fact that the clause *excluded* coverage of more than $300 for auto accident injuries. We read the case not as an "exclusion" case, see n 16 *supra,* but as a preëmption case squarely addressing the issues before us today.

concluded that the federal common-law question framed by the Sixth Circuit in *Auto Club* and *Lincoln Mutual, supra,* required adoption of the pro-rata apportionment rule espoused in *Winstead v Indiana Ins Co,* 855 F2d 430 (CA 7, 1988). *Auto-Owners Ins Co v Thorn Apple Valley,* 818 F Supp 1078 (WD Mich, 1993). Although neither of the recent Sixth Circuit cases articulated a federal common-law rule, both noted, with apparent approval, the *Winstead* decision. *Auto Club,* 961 F2d 594-595; *Lincoln Mutual,* 970 F2d 211.[19]

II

As a threshold matter, we acknowledge both defendants' arguments that plaintiff is not a proper subrogee of its insureds' right to seek payment from their ERISA plans. We disagree.

The ERISA creates a cause of action against an employee benefit plan in favor of participants and beneficiaries. 29 USC 1132(a)(1). A participant is an employee who is or may become eligible to receive a benefit from the plan. 29 USC 1002(7). A beneficiary is one who is designated by a participant or by the terms of the plan as one entitled to a benefit under the plan. 29 USC 1002(8). The ACIA is not an employee and is therefore not a participant. Nor does either plan provide for those other than employees or their designees to receive benefits, and, therefore, it appears that the ACIA is not a beneficiary. The ACIA, however, argues that it is a subrogee of a plan participant or beneficiary, and therefore it may bring its claim for a benefit under the plan on behalf of its insureds—the plan participant and the plan beneficiary.

---

[19] Both of the recent federal district court cases are on appeal to the Sixth Circuit to determine what the federal common law should be in the case of conflicting COB clauses, one of which is contained in an ERISA health and welfare benefits plan.

The federal courts that have addressed this question have not come to any consensus. Some courts hold that ERISA definitions of participant and beneficiary require a narrow, literal interpretation, and because the ERISA itself makes no provision for suits by subrogees, the subrogee has no standing to pursue a claim for benefits. See, e.g., *Allstate Ins Co v The 65 Security Plan,* 879 F2d 90 (CA 3, 1989); *Nationwide Mutual Ins Co v Teamsters Health & Welfare Fund,* 695 F Supp 181 (ED Pa, 1988). Other federal courts, including the United States District Court for the Eastern District of Michigan, have held that a subrogee does have standing to pursue a claim for benefits. *Allstate Ins Co v Operating Engineers,* 742 F Supp 952 (ED Mich, 1990). See also *Misic v Building Service Employees Health & Welfare Trust,* 789 F2d 1374 (CA 9, 1986), and *Hermann Hosp v MEBA Medical & Benefits Plan,* 845 F2d 1286 (CA 5, 1988) (an assignee of a participant has standing to claim benefits).

We believe that the better approach is to permit subrogation as a matter of public policy. Subrogation ensures the rapid payment of benefits to an injured person who might otherwise have to wait for resolution of any litigation over which the insurer is liable for benefits. From the federal standpoint, this comports with the federal policy of benefiting the employees. Although a successful suit has the effect of lowering funds in the ERISA plan, only those funds that are owed to the insured may be collected. Moreover, subrogation benefits this state's citizens for the same reason. Accordingly, we favor the line of federal cases permitting subrogation. See *Operating Engineers, Misic,* and *Hermann Hosp, supra.* See also *Allstate Ins Co v Detroit Millmen's Health & Welfare Fund,* 729 F Supp 1142, 1146 (ED Mich, 1990). We

therefore conclude that a subrogee may stand in the shoes of a subrogor ERISA plan member until we are otherwise directed by federal precedent.

III

Both defendants allege that plaintiff failed to preserve the ERISA issues for appellate review by failing to timely raise them in the proceedings before the circuit courts. In *Frederick & Herrud,* defendant first raised the ERISA preëmption issue after the Michigan Court of Appeals ruled in favor of plaintiff on the basis of its interpretation of the legislative intent behind MCL 500.3109a; MSA 24.13109(1). 145 Mich App 731-734.[20] The ERISA issue was decided in favor of defendant after the United States Supreme Court vacated the judgment of our Court of Appeals with directions to reconsider in light of *FMC Corp.* In *Pentwater,* the Court of Appeals reversed a judgment for the plaintiff in accordance with *Frederick & Herrud.* In short, reconsideration of the ERISA preëmption issue occurred in both cases as a direct result of the United States Supreme Court's mandate in *Frederick & Herrud.* Thus, for the reasons that follow, we hold that the issues were preserved for our review.

First, the ERISA implications in these cases were considered after plaintiff received favorable judgments in both cases. Accordingly, plaintiff was not required to take any steps for the preservation of its ERISA issue concerning the federal common law.[21] Second, the federal courts have made clear their preference for consideration of ERISA issues

---

[20] See also *Federal Kemper,* n 14 *supra.*

[21] See *Washington v Lane,* 840 F2d 443, 444-445 (CA 7, 1988) (an appellee may raise any grounds for an affirmance without filing a cross-appeal).

despite a party's failure to so frame the issues at the commencement of proceedings.[22] In addition, the federal issues were incorporated either directly or indirectly at the behest of the United States Supreme Court with instructions to reconsider in light of *FMC Corp.* Moreover, we note that the recent Sixth Circuit cases deal with complaints originally filed in state courts that were later removed on the defendants' motions. Although the cases before us did not take the same procedural route, we discern from the Sixth Circuit cases a preference for consideration.[23] Third, any delay in the treatment of the ERISA issues is directly attributable to their recent development in the federal courts rather than to any dilatory practice on the part of plaintiff or defendants. Accordingly, this Court is persuaded that plaintiff's arguments merit plenary consideration.[24]

## IV

### A

The ERISA was signed into law by President Gerald Ford on Labor Day, 1974.[25] As the act's title indicates, its primary purpose is the protection of employees' pension rights for plans created under the auspices of the ERISA.[26] The act also attempts

---

[22] See *Miller v Metropolitan Life Ins Co,* 925 F2d 979 (CA 6, 1991) (the trial court properly considered ERISA issues despite the plaintiff's total reliance on state law claims in the complaint).

[23] See *Auto Club* and *Lincoln Mutual, supra.*

[24] Because the issues before us are the subject of federal law, we support our position with federal authority. Were it otherwise, we have at our disposal the rule that an issue may be raised for the first time on appeal where its consideration is necessary to a proper determination of the case. See, e.g., *Joyce v Vemulapalli,* 193 Mich App 225, 228; 483 NW2d 445 (1992).

[25] PL 93-406, tit I, § 2, 88 Stat 832 (codified at 29 USC 1001 *et seq.*).

[26] See, generally, Brummond, *Federal preemption of state insurance regulation under ERISA,* 62 Iowa L R 57 (1976).

to regulate "employee welfare benefit plan[s]."[27] The ERISA's regulation of health and welfare benefit plans is, however, much less expansive than its pension-oriented counterparts.[28] The lack of statutory guidance covering health and welfare plans has led to the development of a "federal common law" intended to supplement the provisions of the ERISA.[29]

The foregoing discussion presupposes preëmption of state law, which thereby creates the void to be filled by the federal common law. In the case of state insurance regulation, preëmption is made more difficult by the existence of over a century's deference by the federal courts to states' expertise in the insurance field. In *Paul v Virginia,* 75 US (8 Wall) 168, 183; 19 L Ed 357 (1868), the United States Supreme Court ruled that the issuance of

---

[27] 29 USC 1002(1) defines the term "employee welfare benefit plan" as

any plan, fund, or program which was heretofore or is hereafter established . . . for the purpose of providing for its participants or their beneficiaries, *through the purchase of insurance or otherwise,* (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . . [Emphasis added.]

[28] See Gregory, *The scope of ERISA preemption of state law: A study in effective federalism,* 48 U Pitt L R 427, 432-433 (1987); Boggess, *ERISA's silent pre-emption of state employee welfare benefit laws: The perils of relying upon the road less traveled,* 1992 Det Col L R 745, 747, 752.

[29] See *Pilot Life Ins Co v Dedeaux,* 481 US 41; 107 S Ct 1549; 95 L Ed 2d 39 (1987). See also *Franchise Tax Bd v Construction Laborers Vacation Trust,* 463 US 1, 24, n 26; 103 S Ct 2841; 77 L Ed 2d 420 (1983) (the "ERISA's legislative history indicates that . . . a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans") (quoting Senator Javits, 120 Cong Rec 29942 [1974]), *In re White Farm Equipment Co,* 788 F2d 1186, 1191 (CA 6, 1986) ("Congress intended to establish employee benefit plan regulation as an exclusive federal concern, with federal law to apply exclusively, even where ERISA itself furnishes no answer").

insurance policies was "not a transaction of commerce" and was therefore "governed by the local law." The United States Supreme Court reversed its position, however, in *United States v South-Eastern Underwriters Ass'n,* 322 US 533; 64 S Ct 1162; 88 L Ed 1440 (1944). In response, in 1945, Congress passed the McCarran-Ferguson Act.[30] Section 1011 provides:

> Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

Section 1012 further provides:

> (a) The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation . . . of such business.
> (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . .

The term "business of insurance" is undefined by the McCarran-Ferguson Act.

In contradistinction the preëmption provisions of the ERISA, 29 USC 1144(a), (b)(2)(A) and (B), which are known as the preëmption, savings, and deemer clauses, respectively, provide:

> (a) Except as provided in subsection (b) of this section, *the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or here-*

[30] 15 USC 1011 *et seq.*

*after relate to any employee benefit plan* described in section 1003(a) of this title and not exempt under section 1003(b) . . . .

* * *

(b)(2)(A) Except as provided in subparagraph (B), *nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.*

(b)(2)(B) *Neither an employee benefit plan described in section 1003(a) of this title . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer,* bank, trust company, or investment company *or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies, insurance contracts,* banks, trust companies, or investment companies. [Emphasis added.]

Evaluation of the issues before us requires us to reconcile these two seemingly conflicting provisions. We begin with a discussion of several United States Supreme Court cases that foreshadow what we believe will become the "federal common law" in this matter.[31]

B

In *Alessi v Raybestos-Manhattan, Inc,* 451 US 504; 101 S Ct 1895; 68 L Ed 2d 402 (1981), the United States Supreme Court concluded that a New Jersey statute forbidding *pension* plans from offsetting retirement benefits by amounts equal to workers' compensation awards was preëmpted by

[31] As the more recent federal cases make clear, the issues considered today are within the province of federal law. See *Auto Club* and *Lincoln Mutual, supra.* Because the Sixth Circuit Court of Appeals has not decided the conflicting clauses issue, and because the district courts are split on its resolution, this Court is called upon to anticipate the ultimate federal position.

the ERISA and therefore had no effect on reduction provisions in ERISA pension plans. According to the Court, "private parties, not the Government, control the level of benefits . . . ." *Id.* at 511. Although the state law ostensibly attempted to regulate workers' compensation benefits and not pension plans, the Court viewed it as a law "relate[d] to pension plans" that attempted to directly control the method by which an ERISA pension plan calculated its benefit payments. *Id.* at 524. In considering Congress' intent regarding possible "integration" of retirement benefits with other forms of compensation, the Court noted Congress' acknowledgment of "the tension between the primary goal of benefiting employees and the subsidiary goal of containing pension costs." *Id.* at 514-515.[32]

In a case involving employee benefits rather than pension benefits, the Court found ERISA preëmption of New York's Human Rights Law, which would have required ERISA plans to provide benefits for pregnancy leave at a time when that

---

[32] The following excerpt from the committee report on the proposed ERISA bill makes clear the delicate balance between individual and collective employee benefits:

"On the one hand, the objective of the Congress in increasing social security benefits might be considered to be frustrated to the extent that individuals with low and moderate incomes have their private retirement benefits reduced as a result of the integration procedures. On the other hand, your committee is very much aware that many present plans are fully or partly integrated and that elimination of the integration procedures could substantially increase the cost of financing private plans. *Employees, as a whole, might be injured rather than aided if such cost increases resulted in slowing down the growth or perhaps even eliminat[ing] private retirement plans.*" [Quoting] H R Rep No 93-807, p 69 (1974), reprinted in 2 Legislative History of the Employee Retirement Income Security Act of 1974 (Committee Print compiled for the Senate Committee on Labor and Public Welfare), 3189 (1976). [451 US 515. Emphasis added.]

was not required by federal law. *Shaw v Delta Air Lines, Inc,* 463 US 85; 103 S Ct 2890; 77 L Ed 2d 490 (1983). The Court noted Congress' intent that the term "relates to" in 29 USC 1144(a) be afforded a broad interpretation so that state laws attempting to govern matters not *specifically* covered by the ERISA were still subject to preëmption. *Id.* at 98. A unanimous Court agreed that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 96-97. Regarding New York's Disability Benefits Law, the Court concluded that, while plans whose benefits are entirely coextensive with provisions required by state law may be excepted from ERISA preëmption,[33] that is not the case where the plan in question is a multibenefit plan. *Id.* at 107. In other words, plans whose sole purpose is to comply with state law are not entitled to ERISA preëmption in an attempt to avoid the effects of state law, whereas plans with coverage in excess of state requirements are the proper subject of preëmption. The piecemeal applicability of state and federal law that would occur if sections of an ERISA plan, rather than the plan itself, were subject to state control under § 1003(b)(3) was characterized as an "administrative impracticality." *Id.*

Several years after the United States Supreme Court defined the ERISA preëmption clause in *Alessi* and *Shaw,* it had occasion to consider the

---

[33] 29 USC 1003(b) provides:

The provisions of this subchapter shall not apply to any employee benefit plan if—

* * *

(3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws.

effect of the saving clause[34] in a case involving state law governing an insurance matter. *Metropolitan Life Ins Co v Massachusetts,* 471 US 724; 105 S Ct 2380; 85 L Ed 2d 728 (1985). Massachusetts law required health insurers, including ERISA health plans, to provide minimum mental health care benefits. The Court held that the saving clause deserved as broad an interpretation as the preëmption clause that saves state-mandated laws *regulating insurance.*[35] *Id.* at 740, 746. The Court further engaged in a restrictive reading of the deemer clause, concluding that it only removed from the purview of the savings clause state insurance regulations "that apply *directly* to benefit plans . . . ." *Id.* at 741 (emphasis added). This distinction would permit indirect regulation of insured ERISA plans but not of self-funded plans. *Id.* at 747.

In *Fort Halifax Packing Co, Inc v Coyne,* 482 US 1; 107 S Ct 2211; 96 L Ed 2d 1 (1987), the Court recognized the ERISA purpose of avoiding variable state regulation that would pose administrative burdens on employers. The majority distinguished between state laws regulating certain *benefits* to be provided by employers and those regulating ERISA *plans. Id.* at 7-8. According to the majority,

[34] 29 USC 1144(b)(2)(A).

[35] To determine whether a law qualifies as one regulating the "business of insurance," and thereby avoids preëmption under the authority of the McCarran-Ferguson Act, see n 30 *supra* and accompanying text, and the saving clause, its ERISA counterpart, three criteria must be considered:

"[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry." [471 US 743, quoting *Union Labor Life Ins Co v Pireno,* 458 US 119, 129; 102 S Ct 3002; 73 L Ed 2d 647 (1982). Emphasis in original.]

state regulation of a plan would subject employers to undesirable administrative burdens while regulation of a benefit, here a one-time severance payment, would not have any radical effect on the administration of the ERISA plan involved. *Id.* at 10-14. Because the effect of Maine's severance pay law would only have a one-time effect on the ERISA plan, it did not truly "relate to" the plan and it therefore was not preëmpted by 29 USC 1144(a). *Id.* at 23. Four justices dissented on the basis of their belief that regulation requiring the payment of specific benefits "clearly 'relate[s] to' benefit plans" as contemplated by the ERISA preëmption provision. 482 US 24 (White, J., dissenting).[36]

The import of the preëmption and the saving clauses having been defined in the previous cases, the Court turned its attention to the deemer clause in *FMC Corp, supra.*[37] The plaintiff in *FMC Corp* was an employer with a self-funded ERISA plan who sought recoupment of medical benefits paid on behalf of an employee's daughter. The subrogation clause in the health plan provided for reimbursement out of any sums collected by the benefits recipient in a liability action against a third party. The defendant asserted that Pennsylvania's antisubrogation statute obviated any duty to reimburse the plaintiff.[38] Consideration of the

[36] The dissent notes that the majority's view would permit state regulation of a benefit as long as the regulation would not require the creation of an administrative scheme. 482 US 24. To the extent that the dissenters are correct, the majority holding would appear to be inconsistent with the *Shaw* holding, which provides in part that "[a] State may require an employer to maintain a disability plan complying with state law as a separate administrative unit." 463 US 108.

[37] For a discussion of the exceptions to preëmption for certain state laws, see, generally, anno: *Construction and application of preemption exemption, under Employee Retirement Income Security Act (29 USC 1001 et seq.,) for state laws regulating insurance, banking, or securities (29 USC 1144[b][2]),* 87 ALR Fed 797.

[38] Section 1720 of Pennsylvania's Motor Vehicle Financial Responsibility Law provides:

preëmption issue in this case led to the most succinct explanation of the preëmption, saving, and deemer clauses to date.

> The pre-emption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that "relate[s] to" an employee benefit plan governed by ERISA. The saving clause returns to the States the power to enforce those state laws that "regulat[e] insurance," except as provided in the deemer clause. Under the deemer clause, an employee benefit plan governed by ERISA shall not be "deemed" an insurance company, an insurer, or engaged in the business of insurance for purposes of state laws "purporting to regulate" insurance companies or insurance contracts. [498 US 58.]

Citing *Shaw,* the *FMC Corp* majority concluded that Pennsylvania's antisubrogation statute related to the ERISA plan. *Id.* at 58-59. The Court also cited *Alessi* and *Fort Halifax, supra,* for the proposition that the Court "ha[d] not hesitated to apply ERISA's pre-emption clause to state laws that risk subjecting plan administrators to conflicting state regulations." *Id.* at 59. Furthermore, the antisubrogation law fell within the purview of the saving

---

In actions arising out of the maintenance or use of a motor vehicle, there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to . . . benefits paid or payable . . . under section 1719 . . . . [75 Pa Cons Stat Ann 1720.]

Section 1719(a) in turn provides:

Except for workers' compensation, a policy of insurance issued or delivered pursuant to this subchapter shall be primary. Any program, group contract or other arrangement for payment of benefits . . . shall be construed to contain a provision that all benefits provided therein shall be in excess of and not in duplication of any valid and collectible first party benefits . . . . [75 Pa Cons Stat Ann 1719(a).]

clause because it "directly control[led] the terms of insurance contracts by invalidating any subrogation provisions that they contain[ed]" and "[i]t [does] not merely have an impact on the insurance industry; it [was] aimed at it." *Id.* at 61.

On the issue of the deemer clause and its effect on the Pennsylvania statute, the majority opined:

> [S]elf-funded ERISA plans are exempt from state regulation insofar as that regulation "relate[s] to" the plans. State laws directed toward the plans are pre-empted because they relate to an employee benefit plan but are not "saved" because they do not regulate insurance. State laws that directly regulate insurance are "saved" but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws. On the other hand, employee benefit plans that are insured are subject to indirect state regulation. An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance" after application of the deemer clause. The insurance company is therefore not relieved from state insurance regulation. The ERISA plan is consequently bound by state insurance regulations insofar as they apply to the plan's insurer. [*Id.*]

As noted earlier, the ERISA's primary purpose is to protect employees' pension rights from abuse.[39] Another clear purpose is to ensure the minimization of costs associated with the establishment of voluntary pension plans.[40] *Alessi, supra* at 515. The

[39] See, generally, Gregory, n 28 *supra* at 443-448, 454 and the authority cited therein.

[40] Employers are not required to establish pension funds for employees under the ERISA. Once such plans are established, however, the ERISA safeguards their proper maintenance. See Gregory, n 28 *supra* at 448.

policy behind ERISA preëmption in the case of health and welfare benefits plans is the same. However, the manifestation of this policy has differed slightly, perhaps because there was less statutory directive and, hence, more likelihood of varying interpretations occurring under case-by-case treatment. Nevertheless, we are persuaded that what must ultimately solidify the federal common law on the multitude of ERISA issues is Congress' intent to prevent "[a] patchwork scheme of regulation [that] would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them."[41] *Fort Halifax, supra* at 11. Moreover, what the recent federal interpretation of the deemer clause makes abundantly clear is that the majority of conflicts between state and federal law and policy will be decided by the federal courts.[42] The only qualifier to ERISA preëmption of state insurance law is indirect regulation via state laws governing insurance companies that assume plan liability in exchange for premiums paid by an ERISA plan. *FMC Corp, supra* at 61.

C

The courts of this state have adhered to an interpretation of MCL 500.3109a; MSA 24.13109(1)

---

[41] The ERISA neither requires the establishment of employee health and welfare benefits plans nor the funding of such plans once established. See Gregory, n 28 *supra* at 449, n 70 and the authority cited therein.

[42] In *Metropolitan Life, supra* at 739-747, the United States Supreme Court read the saving clause broadly to preserve state regulation of insurance. This position, however, was retracted in part by *FMC Corp, supra* at 64, wherein the Court majority concluded that "the language of the deemer clause [was] either coextensive with or broader, not narrower, than that of the saving clause."

that requires a finding that a no-fault insurer is secondarily liable for insurance coverage where there is any other form of health care coverage and where the insurers both sought to escape liability through the use of competing coördination-of-benefits clauses.[43] See, e.g., *Federal Kemper Ins Co, Inc v Health Ins Administration, Inc,* 424 Mich 537, 546; 383 NW2d 590 (1986). The policy behind MCL 500.3109a; MSA 24.13109(1) is avowedly to eliminate duplicative recovery by an insured from both a health insurer and a no-fault insurer, and to contain or reduce no-fault and health care insurance costs.

In *Federal Kemper,* this Court reached the conclusion that the health insurance provider was primarily responsible for payments without considering ERISA preëmption although it appears that the defendant plan was an ERISA plan. However, at the time *Federal Kemper* was decided, the federal position on state regulation of insurance law had long been one of deference to state expertise. See, e.g., *Metropolitan Life, supra* at 742-745 and ns 17-22. While the United States Supreme Court and the Sixth Circuit Court of Appeals have recently concluded that the conflict involved here is to be determined by the federal common law, exactly what that law should be is the subject of differing interpretations between the two federal district courts in this state. It is to this dilemma that we now turn.

### D

At first blush, it would appear that we are

---

[43] For a discussion of conflicting "excess" or coördination-of-benefits clauses, see, generally, anno: *Apportionment of liability between liability insurers each of whose policies provides that it shall be "excess" insurance,* 69 ALR2d 1122; 44 Am Jur 2d, Insurance, §§ 1788-1791, pp 776-780; 16 Couch, Insurance, 2d (rev ed), § 62:79, pp 548-550.

confronted with conflicting public policies: one reflecting federal concern over the continued existence and growth of ERISA health and welfare benefits plans and the other reflecting state concern over spiraling costs in the context of automobile accidents involving no-fault insurers. Our inquiry is further complicated by the fact that the federal policy also accrues to the benefit of the citizens of this state. Federal law requires neither the establishment of health and welfare benefits plans nor minimum funding requirements once the plans are established. State interference in the realm of ERISA benefits could very well be the deciding factor in an employer's decision to establish or adequately fund a health and welfare benefits plan.

Congress' first move in its effort to prevent regulation that would frustrate the purposes behind the ERISA was the enactment of the preëmption clause.[44] By its action, Congress made clear its intention to make federal law and policy supreme in the ERISA context. Its effort was complicated, however, by the passage of the McCarran-Ferguson Act.[45] In recognition of historic federal respect for the primacy of state law in areas traditionally dominated by state regulation, i.e., insurance, banking, and securities, Congress promulgated the ERISA saving clause.[46] Nonetheless, Congress removed from the reach of state regulation pension or health and welfare benefits plans established under the ERISA pursuant to the deemer clause,[47] although it did not specifically forbid any state regulation of insurance, banking, or securities law.

---

[44] 29 USC 1144(a).

[45] See n 30.

[46] 29 USC 1144(b)(2)(A).

[47] 29 USC 1144(b)(2)(B).

Despite the existence of these clauses, workable guidelines in the context of health and welfare benefits plans have developed slowly.

In *Alessi,* the United States Supreme Court held that state law was preëmpted to the extent that it attempted to control the terms of an ERISA pension plan. In *Shaw,* the Court interpreted the preëmption clause to prevent state regulation of welfare benefits in multibenefit ERISA plans, while noting the danger of the administrative difficulty that would result from piecemeal state legislation. Next, the Court defined the saving clause to preserve state law mandating certain minimum benefits in an ERISA plan as long as the state law regulates insurance law rather than an ERISA plan directly. *Metropolitan Life, supra.* Although the Court majority in *Fort Halifax* concluded that a one-time severance payment required by state law did not relate to an ERISA plan so that it was preëmpted, the majority did reiterate the ERISA purpose of avoiding variable state regulation that would pose administrative burdens to plan administrators. Finally, the Court concluded in *FMC Corp* that states could not regulate the contractual terms of ERISA benefits plans in cases of self-funded plans. ERISA plans, however, are subject to indirect regulation in a case in which a state regulates an insurance carrier that has contracted with the plans to provide coverage for claims made on the plans.

Building upon these cases, the Sixth Circuit in *Auto Club* and *Lincoln Mutual, supra,* concluded that MCL 500.3109a; MSA 24.13109(1) was preëmpted by the ERISA. Moreover, the fact that the plans purchased stop-loss insurance did not effect preëmption because § 3109a, as interpreted by cases such as *Federal Kemper, supra,* would have a direct regulatory effect on the ERISA plans.

*Lincoln Mutual,* 970 F2d 210. Now we must anticipate what the federal common law should be.

We take our guidance from the Eastern District's decision in *Lincoln Mutual* on remand because we believe that it best reconciles the tension between state and federal policy. We agree with that court's conclusion that the COB clause in an ERISA policy must be given its clear meaning without the creation of any artificial conflict based upon MCL 500.3109a; MSA 24.13109(1). Therefore, because both plans provide that no-fault insurance is primary where the potential for duplication of benefits occurs, we hold that the ERISA plans' terms control. The no-fault insurer, ACIA, is primarily liable for the benefits at issue. Although the Michigan statute purports to regulate insurance and not ERISA plans, we conclude that it has a direct effect on the administration of the plans in these cases because it would virtually write a primacy of coverage clause into the plans. This is the type of state regulation that would lead to administrative burdens that the historical progression of federal cases recounted earlier forbids.

Moreover, and of equal importance, we are persuaded that the federal policy furthers the state interest of fostering the existence of health and welfare benefits plans for its citizens. Thus, the perceived conflict between state and federal policy is not as marked as plaintiff would have us believe. Earlier we noted that there is no law requiring the establishment or funding of ERISA health and welfare benefits plans. We are also unaware of any state law requiring similar protection. Therefore, there is a considerable state interest in facilitating the creation and voluntary funding of such plans, especially in cases in which there is no automobile no-fault or other insurance to provide benefits. For these reasons, we conclude that MCL

500.3109a; MSA 24.13109(1) does not reach an ERISA plan with a COB clause where that clause is unambiguous.

V

Plaintiff also argues in both cases that, in the event the federal common-law issue is decided adversely to its position, the federal common law would not apply to any amounts that are the subject of "stop-loss" insurance. Again, under the facts of this case, we must disagree.

In *FMC Corp, supra,* the United States Supreme Court ruled that self-funded health and welfare benefits plans were not insurance companies pursuant to the language of the deemer clause and were therefore not subject to regulation by state insurance law. On the other hand, state regulation of insurance companies that would only *indirectly* effect ERISA plans is permitted. 498 US 61. We must therefore distinguish between what is "direct" and what is "indirect" state regulation of these ERISA plans.

Under the terms of the Frederick plan, defendant retains the duties of administrator.[48] The Pentwater plan also provides that defendant Pentwater is the plan administrator.[49] Thus, MCL

---

[48] Under § 14 of the plan, employees requesting benefits pick up forms from the employer. In §§ 15 and 16, the plan covers procedures for denial of claims and for the appeal-of-denials procedure. Finally, § 26, subsection 5 provides that the plan is administered by "Frederick & Herrud, Inc." There is no indication that defendant Frederick & Herrud delegates any authority regarding claims made on the plan.

[49] Although Pentwater set up a trust as its way of setting aside sufficient funds, that trust provides in art II, § 2.1 that the trustee "shall, from time to time *at the direction of the Plan Administrator or the Corporation,* make payments out of the Trust Fund . . . ." Moreover, art V, § 5.2 of the Pentwater plan defines the plan administrator as "The Employer." In addition, the "stop-loss" policy issued to defendant by Safeco provides that it will reimburse defendant for benefits *"paid for covered persons under your plan."* Accordingly, all

500.3109a; MSA 24.13109(1) and the cases interpreting it would have the effect of removing all discretion from the plan administrators on the issue whether to pay health benefits when other sources of payment exist. We are persuaded that this qualifies as a direct rather than an indirect effect on the plans.

This very point was recognized in *Lincoln Mutual*, 970 F2d 210. Although the Sixth Circuit did not invalidate the state law, the court concluded that the direct effect required preëmption under *FMC Corp* so that the issue had to be decided as a matter of federal law. For the policy reasons stated previously, we conclude that the existence of "stop-loss" insurance is irrelevant in this case because any regulation of it would have a significant effect on the administration of the ERISA plans involved.[50]

## VI

### CONCLUSION

In sum, we conclude that subrogation is permitted under the ERISA and that the issues considered here were preserved for this Court's review. Further, we hold that an unambiguous COB clause in an ERISA health and welfare benefit plan must be given its plain meaning despite the existence of a similar clause in a no-fault policy because any conflict created by the requirements of MCL 500.3109a; MSA 24.13109(1) and this Court's interpretation of the statute would have the direct

discretion regarding the payment or denial of claims remains with defendant.

[50] See *Wolverine Mutual Ins Co v Rospatch Corp Employee Benefit Plan*, 195 Mich App 302, 308, n 2; 489 NW2d 204 (1992) ("[A]n insurance policy that merely protects the plan from disastrous consequences, but does not directly insure the obligations owed to the plan members, does not affect the plan's status as self-insured").

effect of dictating the terms of the ERISA plans. To the extent that our decision in *Federal Kemper* is inconsistent with our holding today, it is overruled. We emphasize, however, that the primacy of health care coverage over that in a no-fault policy continues in Michigan jurisprudence in all cases not within the purview of this narrow holding. We also conclude that the existence of stop-loss insurance has no bearing on the outcome here because discretion to pay or deny claims remains in the ERISA plan and was never delegated to the insurers.

Affirmed.

CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.