**Michigan Supreme Court**
**Lansing, Michigan 48909**

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

# Opinion

**FILED JULY 31, 2002**

CHARLES SINGTON,

    Plaintiff-Appellee,

v                                                          No. 119291

CHRYSLER CORPORATION, also known as
DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

This case concerns eligibility for worker's compensation benefits pursuant to the Worker's Disability Compensation Act (WDCA) definition of disability at MCL 418.301(4) and the reasonable employment provisions, MCL 418.301(5), of that act. The Court of Appeals effectively concluded that under § 301(4)'s definition of disability as interpreted in *Haske v Transport Leasing, Inc,* 455 Mich 628; 566 NW2d 896 (1997), plaintiff was disabled and entitled to wage loss benefits. We

conclude that the *Haske* definition of disability is erroneous and should be overruled.  Accordingly, we vacate the decision of the Court of Appeals and remand the case to the WCAC for further proceedings consistent with this opinion.

I

A

A review of the relationship in the worker's compensation statute between "disability" and "favored work" (or as it is now formally called in the WDCA, "reasonable employment") is helpful in understanding what is at issue in this case.

There are circumstances in which a work-related injury might prevent an employee from continuing to perform one or even more of the complex of tasks in the job he was performing at the time of the injury, but in which, even with such a limitation, that  employee may still be able to perform the job sufficiently so that his wage earning capacity is not affected in that job.  For example, such an injury might render an employee unable to perform a job that requires continuous standing, but nevertheless leaves the employee able to perform a job suitable to his qualifications and training in which the  employee can sit while performing most or all his job duties to the degree that his ability to earn equivalent wages is not different than before the injury.

Historically, such a situation posed a dilemma for the

worker's compensation system.   As the courts dealt with difficult cases in which an employee could suffer a work-related injury and be limited, to one degree or another, in his ability to perform work, but not rendered altogether unable to work, judges developed the common-law mitigation doctrine of "favored work."  Under the favored-work doctrine, an employer could generally require an injured employee, eligible for worker's compensation benefits, to do other work that the employee was reasonably capable  of performing.  The wages earned in the "easier" job could be used by the employer as a setoff, or mitigation, against  the employer's worker's compensation liability.  If the employee unreasonably refused to participate in the favored work, i.e., the "easier job," the penalty was loss of worker's compensation benefits.[1]

---

[1] This Court described the former favored-work doctrine as follows:

> The favored-work doctrine is a purely judicial creation.  Favored, or light, work can be loosely defined as less strenuous post-injury work.  Wages from favored work may be used as a setoff against an employer's compensation liability, but favored-work wages do not establish an earning capacity, and when such wages cease, they neither suspend nor bar compensation.
>
> The primary purpose of the doctrine is that of mitigation.  It allows an employer to reduce or completely eliminate compensation payments by providing work within the injured employee's physical capacity. At the same time, it encourages the employee to return to productive employment

(continued...)

There were also common-law protections that the courts developed to protect the employee from being exploited during the period he was engaged in favored work.[2] This approach to favored work, with its emphasis on mitigation, was felt to advance the interests of the employee by encouraging his reentry into the workplace, as well as the interests of the employer in limiting its ongoing worker's compensation liability.

In 1982, the Legislature effectively displaced the common-law doctrine with the enactment of a statutory approach that drew heavily upon the favored-work doctrine[3] (now called "reasonable employment"[4]).  Importantly, the legislation

---

[1](...continued)
rather than to remain idle, thus also serving a rehabilitative function.  [*Bower v Whitehall Leather Co,* 412 Mich 172, 182; 312 NW2d 640 (1981) (citations omitted).]

[2] For example, reasonable employment in a "make work" position not reflective of earning capacity in the ordinary job market could not be abused by an employer to "establish" a wage earning capacity to allow the employer to discharge the employee while escaping further liability for benefits.  See *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418; 145 NW2d 40 (1966).

[3] In particular, the Legislature made provisions, as set forth in n 5, providing generally for resumption of worker's compensation benefits if an employee lost reasonable employment.

[4] The current version of the WDCA provides the following definition of "reasonable employment":

(continued...)

stated that, as a prerequisite to being considered a
participant in reasonable employment (MCL 418.301[5])[5] an

---

[4](...continued)
"Reasonable employment", as used in this
section, means work that is within the employee's
capacity to perform that poses no clear and
proximate threat to that employee's health and
safety, and that is within a reasonable distance
from that employee's residence. The employee's
capacity to perform shall not be limited to jobs in
work suitable to his or her qualifications and
training. [MCL 418.301(9).]

[5] MCL 418.301(5), the reasonable employment section,
provides:

If disability is established pursuant to
subsection (4), entitlement to weekly wage loss
benefits shall be determined pursuant to this
section and as follows:

* * *

(d) If the employee, after having been
employed pursuant to this subsection for 100 weeks
or more loses his or her job through no fault of
the employee, the employee shall receive
compensation under this act pursuant to the
following:

(i) If after exhaustion of unemployment
benefit eligibility of an employee, a worker's
compensation magistrate or hearing referee, as
applicable, determines for any employee covered
under this subdivision, that the employments since
the time of injury have not established a new wage
earning capacity, the employee shall receive
compensation based upon his or her wage at the
original date of injury. There is a presumption of
wage earning capacity established for employments
totalling 250 weeks or more.

(ii) The employee must still be disabled as
determined pursuant to subsection (4). If the
(continued...)

employee must first suffer a "disability," as defined in MCL 418.301(4).[6] Because an employee engaged in reasonable employment is afforded significant statutory protections[7] once the reasonable employment commences, it is critical to employers and employees alike that it be clear which workers

---

[5](...continued)
employee is still disabled, he or she shall be entitled to wage loss benefits based on the difference between the normal and customary wages paid to those persons performing the same or similar employment, as determined at the time of termination of the employment of the employee, and the wages paid at the time of the injury.

(iii) If the employee becomes reemployed and the employee is still disabled, he or she shall then receive wage loss benefits as provided in subdivision (b).

(e) If the employee, after having been employed pursuant to this subsection for less than 100 weeks loses his or her job for whatever reason, the employee shall receive compensation based upon his or her wage at the original date of injury.

[6] MCL 418.301(4) in full provides the following definition of "disability":

As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss.

[7] Section 301(5)(e) provides that, if reasonable employment is lost "for whatever reason" within one hundred weeks, the employee shall receive compensation on the basis of the employee's wage when injured. Similarly, § 301(5)(d) generally provides for resumption of worker's compensation benefits if reasonable employment is lost after one hundred weeks "through no fault of the employee."

6

are considered disabled under § 301(4). It is this condition precedent to "reasonable employment"—disability—that is the central issue in this case.

B

Plaintiff, Charles Sington, was employed by defendant, Chrysler Corporation, from July 1971 until March 1997. During his last fifteen years, he performed various production-related jobs as a "floater." Until he was injured, plaintiff's physical activities in the course of his employment included reaching and stretching out above head level, and bending and picking up parts weighing up to thirty pounds.

In June 1994, plaintiff slipped and fell at work, injuring his left shoulder. It is undisputed that the 1994 injury arose in the course of his employment and that defendant voluntarily paid wage loss benefits following that injury. Plaintiff underwent surgery on his left shoulder. Upon returning to work in January 1995, he was restricted from performing work requiring him to reach above the left shoulder. He continued working as a floater with this work restriction until his right shoulder was injured outside his employment. Plaintiff underwent surgery on his right shoulder in August 1996 for a non-work-related injury and was off work until November 1996 when he returned to work as a floater.

7

Defendant then honored plaintiff's expanded work restrictions that precluded him from lifting, pushing, or pulling over twenty pounds. It is uncontested that plaintiff's average weekly wage was the same before and after both the shoulder injuries.

Plaintiff continued as a floater until March 1997 when he suffered a non-work-related stroke. After the stroke, plaintiff received sickness and accident benefits and was then granted a permanent and total disability pension by defendant.

Thereafter, plaintiff sought worker's compensation benefits related to his inability to work. Plaintiff asserted that he was working in "reasonable employment" under the WDCA when he performed his job with a work restriction after the left shoulder injury, and that he became entitled to worker's compensation benefits when he lost this reasonable employment because of the stroke. This claim is grounded in the interaction between § 301(4) and § 301(5). As mentioned earlier, note 5, if an employee is disabled under § 301(4) and then is afforded reasonable employment under § 301(5), should that employment be terminated before one hundred weeks pass, the employee receives worker's compensation benefits on the basis of the wage at the date of injury under § 301(5)(e). If, on the other hand, one hundred or more weeks have passed and the worker loses the employment through no fault of his

8

own, eligibility for benefits is determined under § 301(5)(d).

While, in this case, no one disagrees with the rules of reasonable employment, there *is* dispute over whether plaintiff was "disabled" under § 301(4). Plaintiff asserts he was disabled because his left shoulder injury precluded him from performing all the tasks he performed as a "floater" before that injury. Defendant's position is that, before the stroke, plaintiff was not disabled because the left shoulder injury had not reduced his "wage earning capacity" as that is understood in § 301(4), and, thus, once returned to work, plaintiff was not engaged in reasonable employment, with all its attendant benefits, at the time of the stroke. Accordingly, defendant asserts that, as with any other employee who became unable to work because of a non-job-related injury, plaintiff has no remedy in the worker's compensation system.

Faced with the question whether plaintiff was disabled under § 301(4), the worker's compensation magistrate ruled that plaintiff was not engaged in reasonable employment under § 301(5). The magistrate opined that plaintiff had been "performing a regular plant job" after his left shoulder injury and that he was convinced that plaintiff "did not experience any wage loss, whatsoever" because of that injury. The magistrate further concluded that plaintiff was disabled

because of his non-work-related stroke and that, but for the stroke, plaintiff "would have continued at his regular job, a job which was conveniently within his recommended restrictions." Because plaintiff's wage loss was attributable to his stroke rather than his shoulder injury, "his partial disability, based on his . . . workplace injury, [was] not compensable . . . ."

The WCAC affirmed the magistrate's decision. It concluded that the factual record supported the magistrate's determination that plaintiff was performing his "regular job" when he returned to work after the left shoulder injury. Thus, the WCAC stated, the job "did not constitute an accommodation of [plaintiff's] injury, so as to be 'reasonable employment' under Section 301(5)." Accordingly, the WCAC further stated that plaintiff did not have a compensable disability when he continued to "perform his regular job" for defendant after his left shoulder injury because "it was the stroke which clearly and directly was the reason for his subsequent wage loss."

The Court of Appeals reversed the WCAC. 245 Mich App 535; 630 NW2d 337 (2001). The panel held "as a matter of law that defendant offered plaintiff 'reasonable employment' within the meaning of" MCL 418.301(9). *Id*. at 552. It further concluded that, once an injured employee is engaged in reasonable

10

employment, the specific provisions pertaining to reasonable employment found in § 301(5)(e) take precedence over the general requirement of *Haske* that, to be compensable, wage loss must be causally linked to work-related injury. Thus, the Court concluded that plaintiff was engaged in reasonable employment at the time of the stroke. Thereafter, we granted defendant's application for leave to appeal.

Critical to the proper resolution of this appeal is how "disability" is defined in the WDCA, MCL 418.301(4). In *Haske,* this Court adopted an interpretation of "disability" that encompassed any work-related injury that renders an employee unable to do one or more particular jobs within the employee's qualifications and training. Because plaintiff in this case had to be accommodated to some degree in his "floater" position, it can be argued that, under the *Haske* definition, plaintiff was working at—and "disabled" from—a different job *before* his left shoulder injury than the reconfigured "floater" job to which he returned after his injury. Thus, when he suffered the stroke, as an employee entitled to reasonable employment status, plaintiff could claim the benefits that flow to an employee performing reasonable employment who, through no fault of his own, loses

his ability to continue to perform reasonable employment.[8]

An alternative view of disability advanced by defendant requires a reduction in an employee's actual wage earning capacity in all work suitable to his qualifications and training. Under this approach, an employee would not be disabled if a work-related injury rendered him unable to perform a particular job, but where that limitation did not affect the wages that he could earn. In particular, with regard to plaintiff, defendant argues that, if one examines overall wage earning capacity, plaintiff was not disabled because his postinjury work as a floater caused him no reduction in wage earning capacity. Thus, he was not entitled to be considered a participant in reasonable employment at the time of the stroke and, because the stroke was not work related, he is not entitled to benefits under § 301(5).

II

We review questions of law in final orders from the WCAC de novo. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 401;

_____

[8] It is not clear how many weeks plaintiff worked at what he alleged to be "reasonable employment" job. As indicated previously, if an employee loses reasonable employment "for whatever reason" within one hundred weeks, he is entitled to worker's compensation benefits on the basis of his wage at the time of injury under § 301(5)(e). If one hundred or more weeks have passed, determination of eligibility for worker's compensation benefits if an employee loses reasonable employment "through no fault of the employee" is based on the more complex factors set forth in § 301(5)(d).

12

605 NW2d 300 (2000).

### III

### A

We begin our analysis with the definition of "disability" in the WDCA:

> As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss. [MCL 418.301(4).]

As this language plainly expresses, a "disability" is, in relevant part, a limitation in "wage earning capacity" in work suitable to an employee's qualifications and training. The pertinent definition of "capacity" in a common dictionary is "maximum output or producing ability." *Webster's New World Dictionary* (3d College ed). Accordingly, the plain language of MCL 418.301(4) indicates that a person suffers a disability if an injury covered under the WDCA results in a reduction of that person's maximum reasonable wage earning ability in work suitable to that person's qualifications and training.

So understood, a condition that rendered an employee unable to perform a job paying the maximum salary, given the employee's qualifications and training, but leaving the employee free to perform an equally well-paying position suitable to his qualifications and training would not

13

constitute a disability.[9]

Our analysis in this regard is consistent with the following conclusion of this Court in *Rea v Regency*

---

[9] We recognize that pre-1987 Michigan case law once drew a distinction with regard to wage earning capacity between "skilled" and "unskilled" workers. A skilled worker was considered to have an impairment of earning capacity, and thus would be entitled to compensation, if a work-related injury rendered the employee unable to continue earning the same level of wages in his particular skilled employment, even if the same wages could be earned at another type of employment. See, e.g., *Kaarto v Calumet & Hecla, Inc,* 367 Mich 128, 131; 116 NW2d 225 (1962); *Geis v Packard Motor Car Co,* 214 Mich 646, 648-649; 183 NW 916 (1921). Similarly, an unskilled or "common" laborer had to show a limitation in wage earning capacity in the entire field of "unskilled" labor. See *Leitz v Labadie Ice Co,* 229 Mich 381; 201 NW 485 (1924); *Kling v National Candy Co,* 212 Mich 159; 180 NW 431 (1920). This dichotomy between skilled and unskilled labor led to some anomalous results. In *Geis,* the plaintiff was held to have a compensable disability because of an injury that precluded him from performing the skilled employment he was performing at the time of his injury even though he worked for *higher* wages in somewhat related employment. See *Kaarto, supra* at 131 (discussing *Geis*). Conversely, in *Leitz,* the plaintiff was held entitled to continuation of a disability award on the basis of being disabled from common labor even though he was earning higher wages as a bookkeeper and accountant.

However, when the present definition of disability was adopted in 1987, the Legislature replaced its prior reference to a limitation in wage earning capacity in "the employee's general field of employment" with "work suitable to his or her qualifications and training." This means that the inquiry is now focused on an employee's qualifications and training, not merely the general field of employment in which the employee happened to work at the time of a work-related injury. Thus, the prior common-law skilled/unskilled dichotomy has no significance under the current statutory language . Because there is no textual basis in the statute for the selection and application of *either* historical definition of "wage earning capacity," we examine the plain meaning of the words found in the statute.

14

*Olds/Mazda/Volvo,* 450 Mich 1201; 536 NW2d 542 (1995):

> A majority of the Court is of the opinion that the 1987 definition of disability in the Worker's Disability Compensation Act[10] requires a claimant to demonstrate how a physical limitation affects wage-earning capacity in work suitable to the claimant's qualifications and training. It is not enough for the claimant claiming partial disability to show an inability to return to the same or similar work. If the claimant's physical limitation does not affect the ability to earn wages in work in which the claimant is qualified and trained, the claimant is not disabled.

The *Rea* formulation implicitly drew upon an earlier articulation on this topic in *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418, 423; 145 NW2d 40 (1966), in which this Court stated:

> [T]he method of determining the employee's earning capacity, as that term is used in the act, is a complex of fact issues which are concerned with the nature of the work performed and the continuing availability of work of that kind, and the nature and extent of the disability and the wages earned.

While we recognize that *Pulley* was decided before the adoption of the current definition of "disability" in § 301(4) and, thus, some particulars of that opinion may not be controlling with regard to the current statutory scheme, we believe that this language is instructive in indicating that worker's compensation magistrates and the WCAC may have to consider various factual matters in determining whether an employee is

---

[10] That is the current definition of disability in the WDCA, MCL 418.301(4).

15

disabled.  Such matters could include the particular work that an employee is both trained and qualified to perform, whether there continues to be a substantial job market for such work, and the wages typically earned for such employment in comparison to the employee's wage at the time of the work-related injury.  If the employee is no longer able to perform any of the jobs that pay the maximum wages, given the employee's training and qualifications, a disability has been established under § 301(4).

Under the *Pulley* and *Rea* approach, rather than concluding that any employee who is unable to perform a single job because of a work-related injury has a "disability" under § 301(4), a worker's compensation magistrate or the WCAC should consider whether the injury has actually resulted in a loss of wage earning capacity in work suitable to the employee's training and qualifications in the ordinary job market.

In sum, we conclude, as did the *Rea* Court before us, that "disability" as defined in MCL 418.301(4) cannot plausibly be read as describing an employee who is unable to perform one particular job because of a work-related injury, but who suffers no reduction in wage earning capacity.

B

This conclusion stands in contrast to the one the *Haske* majority reached.  In *Haske, supra* at 634, this Court

16

concluded that § 301(4) defined disability as "a personal injury or work-related disease that prevents an employee from performing any work, even a single job, within his qualifications and training . . . ." Because of the words the Legislature used in § 301(4), the *Haske* definition of disability is untenable. The plain meaning of the definition of "disability" in § 301(4) as "a limitation of an employee's wage earning capacity in work suitable to his qualifications and training" precludes regarding a person as disabled when an inability to perform one particular job does not, in fact, reduce that person's wage earning capacity in other, equally well-paying work suitable to his qualifications and training. Section 301(4) specifically directs the reader to a consideration of whether there is a limitation in wage earning capacity, not of whether a person is merely limited in performing one (or more) particular jobs.

In this regard, Justice Weaver astutely observed in her partial dissent in *Haske*:

> I believe that the most basic interpretation of "wage earning capacity" is that it describes an employee's ability to earn wages. Perhaps because an employee is theoretically able to earn wages in a great variety of ways, the Legislature restricted consideration to "work suitable to [an employee's] qualifications and training." Where an employee is qualified and trained in more than one job, then his wage-earning capacity includes consideration of all those jobs under the plain meaning of subsection 301(4). Whether "a limitation" exists in an individual's "wage earning capacity" where

17

> that individual is qualified and trained in more
> than one job therefore requires consideration of
> the effect of the work-related disease or injury on
> earning capacity in *all those jobs* in which the
> individual is qualified and trained.  The statute
> does not state or imply that inability to perform
> one job within the individual's qualifications and
> training necessarily results in "a limitation [in]
> wage earning capacity."  Thus, I cannot agree with
> the majority's conclusion that "an employee is
> disabled if there is at least a single job within
> his qualifications and training that he can no
> longer perform."  I believe the majority's
> conclusion fails to consider whether the *overall*
> wage-earning capacity of the individual was
> actually limited and, therefore, is not true to the
> plain language of subsection 301(4).  [*Haske, supra*
> at 668 (Weaver, J., concurring in part and
> dissenting in part) (first emphasis in original,
> second emphasis added; citation omitted).]

We agree with Justice Weaver that the language of § 301(4) requires a determination of overall, or in other words, maximum, wage earning capacity in all jobs suitable to an injured employee's qualifications and training.

We recognize that the *Haske* majority placed substantial reliance on the second sentence of § 301(4), which states that "[t]he establishment of disability does not create a presumption of wage loss."  The *Haske* majority stated that this sentence "eliminates the possibility that disability and wage loss are defined the same way . . . ." *Haske, supra* at 654-655.  Apparently, the concern of the *Haske* majority was that there would be no distinction between "wage loss" and "disability" if a showing of disability required  an overall

18

limitation in "wage earning capacity" in all work suitable to an employee's qualifications and training. That is, the *Haske* majority was concerned that reading the first sentence in accordance with its plain meaning would render the second sentence nugatory.

However, we do not believe that this concern was justified. As an initial matter, the focus of the inquiry is not on every single job suitable to an employee's qualifications and training—only those that produce the maximum income. Further, the second sentence reflects an understanding that there may be circumstances in which an employee, despite suffering a work-related injury that reduces wage earning capacity, does not suffer wage loss.[11] For example, an employee might suffer a serious work-related injury on the last day before the employee was scheduled to retire with a firm intention to never work again. In such a circumstance, the employee would have suffered a disability, i.e., a reduction in wage earning capacity, but no wage loss because, even if the injury had not occurred, the employee would not have earned any further wages.

---

[11] We note that, once it is found that an employee is disabled under § 301(4), the employee must then establish wage loss in order to compute wage loss benefits under MCL 418.361. The clear language of the second sentence of § 301(4) militates against any holding that the terms "wage earning capacity" and "wage loss" are synonymous.

19

In light of the inconsistency of *Haske* with the plain language of § 301(4), we overrule it and return to the rule established in *Rea,* which was harmonious with the language of the statute.

C

In overruling the *Haske* interpretation of disability, we return to the proper understanding of disability in case law that preceded *Haske* and that, in our judgment, was more faithful to the WDCA's statutory language.

We recognize that following prior decisions of this Court under the doctrine of stare decisis is generally the preferred course of action "'because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Robinson v Detroit,* 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States,* 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). Nevertheless, stare decisis is "not to be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes." *Robinson, supra* at 463. Rather, it is "'our duty to re-examine a precedent where its reasoning . . . is fairly called into question.'" *Id.* at 464, quoting *Mitchell v W T Grant Co,* 416 US 600, 627-628; 94 S Ct 1895; 40 L Ed 2d

20

406 (1974) (Powell, J., concurring). In the present case, the treatment of the term "disability" as used in § 301(4) of the WDCA has been fairly called into question.

In considering whether to overrule a prior decision of this Court, the first inquiry, of course, is whether that prior decision was wrongly decided. *Robertson v DaimlerChrysler Corp,* 465 Mich 732, 757; 641 NW2d 567 (2002); *Robinson, supra* at 464. For the reasons we have previously discussed, *Haske* was wrongly decided because it is clearly inconsistent with the plain language of the definition of "disability" in § 301(4).

Nevertheless, as we recognized in *Robinson,* that a prior case was wrongly decided "does not mean overruling it is invariably appropriate." *Robinson, supra* at 465. We must consider whether overruling a prior erroneous decision would work an undue hardship because of reliance interests or expectations and, conversely, whether the prior decision defies "practical workability." *Robertson, supra* at 757; *Robinson, supra* at 466. In particular,

> the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations. It is in practice a prudential judgment for a court. [*Id.*]

In the present case, we see no significant reliance interest

or expectation that will be disrupted by overruling *Haske*. Obviously, a work-related injury potentially compensable under the worker's compensation system is an unexpected event, so it is difficult to imagine actions that an employee would take in reliance on *Haske.* Moreover, it is doubtful that there could be a legitimate expectation interest in receiving worker's compensation *wage loss* benefits on the basis of an earlier work-related injury that did not, in fact, result in any overall reduction in wage earning capacity in work suitable to one's qualifications and training. Also, while a less significant factor, we see reason for concern about the "practical workability" of *Haske,* particularly in terms of deciding what constitutes a single job for the purpose of applying that decision.

Further, it is particularly appropriate to overrule a prior erroneous decision of this Court that has failed to apply the plain language of a statute. As we observed in *Robinson, supra* at 467, "it is to the words of the statute itself that a citizen first looks for guidance in directing his actions." Indeed, when a court confounds the legitimate expectations of a citizen by misreading a statute, "it is that court itself that has disrupted the reliance interest." *Id.* As we observed in *Robertson, supra* at 756, the values underlying general respect for stare decisis are also enhanced

"by a legal regime in which the public may read the plain words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers." Because *Haske* failed to apply the plain language of the definition of "disability" in § 301(4), and in light of the lack of a significant reliance interest in the *Haske* decision, we are impelled to overrule it.

IV

In our order granting leave to appeal in this case, we further directed the parties to address "whether *Haske . . .* and *Powell v Casco Nelmor Corp,* 406 Mich 332[; 279 NW2d 769] (1979), are reconcilable." 465 Mich 940 (2002). However, in light of our determination that the *Haske* definition of disability is erroneous and should be overruled, it is no longer necessary to consider whether *Haske* and *Powell* may be reconciled.

Moreover, *Powell* was decided under the old common-law "favored work" doctrine, before that doctrine was effectively codified by the Legislature in the WDCA in its "reasonable employment" provisions. Codification of common-law rules makes those rules of no consequence if they are inconsistent with the codification. In *Perez v Keeler Brass Co,* 461 Mich 602, 606; 608 NW2d 45 (2000), we discussed the effect of codification on common-law rules regarding favored work:

23

Subsection (5) [of the WDCA, related to reasonable employment] was added to the statute in 1982. Before that time, the statute did not address "reasonable employment," and this issue was governed by an area of the common law known as the "favored-work doctrine." Now, however, the quoted statutory provisions establish the law in this area. The Legislature chose the words of the statute, and we are bound by them. Any cases decided under the common law before subsection (5) was enacted are essentially irrelevant; to the extent that the common-law favored work doctrine is inconsistent with the plain language of the statute, the Legislature has changed the common law. [Citations omitted.]

Accordingly, in considering whether a person who has ceased working in a "reasonable employment" position is entitled to worker's compensation wage loss benefits, worker's compensation magistrates and the WCAC should examine the provisions of MCL 418.301(5)(d) and (e), rather than decisions under the old common-law favored work doctrine such as *Powell.* In short, as *Perez* indicates, *Powell* is now "essentially irrelevant."

V

We now turn to the circumstances of this case. Plaintiff was qualified and trained as a "floater," although there is no indication in the record regarding whether plaintiff was qualified and trained in any other jobs. To illustrate the application of our analysis, we will assume for the moment that plaintiff's job as a floater produced the maximum wages in work suitable to plaintiff's qualifications and training,

24

although the WCAC on remand may find otherwise.  Plaintiff was evidently able to perform a variety of production-related tasks as a "floater."  His physical restriction after his left shoulder injury that precluded him from lifting above shoulder level is the only relevant restriction because the right shoulder injury was not work-related.  In order to establish that he had a "disability" because of the left shoulder injury, plaintiff had to show that that injury resulted in a limitation in his wage earning capacity in work suitable to his qualifications and training.

The magistrate and WCAC did not apply this test.  Rather, they focused, pursuant to *Haske,* on the fact that plaintiff was working in a "regular job" after his left shoulder injury. While that may be a strong indication that the left shoulder injury did not amount to a disability, it is not, standing alone, dispositive.  An inquiry must be made regarding whether the "regular job" was suitable to plaintiff's qualifications and training at the time of the injury.  Also, if plaintiff's injuries only enabled him to perform that "regular job" because of accommodations provided by defendant, his wage earning capacity might be less than his actual wages.[12]

---

[12] However, a work-related injury that has a de minimus effect on an employee's job-related duties might not amount to a disability.  This is because many employers might  disregard such minor limitations in hiring applicants generally, meaning
(continued...)

Accordingly, we conclude that this case should be remanded to the WCAC for reconsideration in accordance with this opinion.

## VI

Justice Kelly's dissent merits a response.  As Justice Kelly has pointed out, in the last three and a half years, there have been cases reversing past precedent of this Court. She cites sixteen.[13]  These should be seen in the context of the overall number of dispositions by this Court  during the same period.  From January 1, 1999 to June 30, 2002, there were 8,198 dispositions by this Court.[14]  Thus, it is rare (in fact, a frequency of under one-fifth of one percent) when

---

[12](...continued)
that such minor conditions would not effect an employee's ability to perform his top paying job and would therefore not limit  his wage earning capacity.  A useful perspective for the WCAC in considering this case on remand might be considering whether plaintiff's injuries would prevent him from competing in the marketplace with other workers for the "regular job."  The WCAC might also consider whether defendant would have continued plaintiff in the "regular job" at the same rate of pay if he was injured in a non-work-related incident.  If plaintiff would have been hired or retained despite his injury, this would indicate that plaintiff did not suffer a disability because the pertinent injury did not impair his wage earning capacity.  Conversely, if defendant would not have hired plaintiff or would not have accommodated plaintiff's injury except for it being work related, that would be indicative of a limitation in wage earning capacity.

[13] See slip op at n 2.

[14] The Supreme Court Clerk's data reflects that there were 2,571 dispositions
in 1999, 2,302 in 2000, 2,359 in 2001, and 966 from January 1 to June 30, 2002.  Dispositions include opinions of this Court, peremptory orders, dismissals, and denials of leave.

26

precedent is overturned, but it does sometimes happen.  During this period, the issue of treatment of precedent has arisen primarily in  review of earlier Supreme Court cases interpreting statutes.  In fact, of the cases that Justice Kelly has cited where precedent has been overruled, eleven are within this category.[15]  As the dissents to these actions have been forceful, so as  to inform as to the doctrine of stare decisis and its limits, this Court in *Robinson* chose to discuss the doctrine in depth as well as its proper application.

Repeatedly, since Robinson was decided, the rules established in that case, which it should be  noted are themselves entitled to respect as precedents of this Court, have been disregarded in dissents authored by Justice Kelly without any indication of what part of the rules set  forth in *Robinson* she would alter.[16]  Even more consequentially, she has

---

[15] *People v Cornell*, 466 Mich 335; 646 NW2d 127 (2002); *Koontz v Ameritech Services, Inc*, 466 Mich 335; 645 NW2d 34; *Robertson, supra; Pohutski v City of Allen Park,* 4465 Mich 675; 641 NW2d 219 (2002); *Hanson v Mecosta Co Rd Comm,* 465 Mich 492; 638 NW2d 396 (2002); *Brown v Genesee Co Bd of Commr's,* 464 Mich 430; 628 NW2d 471 (2001), *People v Glass,* 464 Mich 266; 627 NW2d 261 (2001); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 615 NW2d 702 (2002); *Mudel v Great Atlantic & Pacific Tea Co,* 462 Mich 691; 614 NW2d 607 (2002); *Robinson, supra; People v Lukity,* 460 Mich 484; 596 NW2d 607 (1999).

[16] See *People v Hardiman,* 466 Mich 417; 646 NW2d 158 (2002) (Kelly, J., dissenting); *Cornell, supra* (Kelly, J., (continued...)

failed to make clear what rules, if any, she would follow in determining when to affirm or reject precedents. What is it, for example, that distinguishes *Lesner v Liquid Disposal,* 466 Mich 95; 643 NW2d 553 (2002), in which Justice Kelly would overrule an interpretation of a statute, from those cases in which she would not? Today, however, she has apparently set down her rules, and that is to be welcomed. She appears to approve the *Robinson* standard that stare decisis should not be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes. As to implementing this approach, the *Robinson* test asserts that it is a supreme court's duty to reexamine a precedent where its reasoning is fairly called into question or, to put it more simply, when it is wrong. Justice Kelly differs in this regard, however, because, as we understand her position, she would not reexamine a precedent unless the prior decision was "utterly nonsensical," slip op at 10, n 7, or reflected a "drastic error," slip op at 10. Otherwise, she would allow that which even she would concede to be erroneous interpretations of the law to prevail.

Further, under *Robinson,* if the prior Court decided

---

[16](...continued)
dissenting); *Pohutski, supra* (Kelly, J., dissenting); *Nawrocki, supra* (Kelly, J., dissenting); *Mudel, supra* (Kelly, J., dissenting).

wrongly , that was not the end of the stare decisis inquiry, because the Court must also consider whether there are reliance interests such that, to overrule the prior case, would produce real world dislocations. *Id.* at 466. If that were so, then even though a case had been decided incorrectly, stare decisis should be respected and the case should not be overruled. As to this point, Justice Kelly would seem to agree, more or less, as she states in her dissent that she would determine if customs had changed or there were unforeseen practices. Slip op at 9-10.

These, then, are the differences between the *Robinson* approach and Justice Kelly's approach. *Robinson* would allow the overruling of a prior case interpreting a statute if it was wrong unless there were reliance interests so great that overruling the prior decision would produce real world dislocations. Justice Kelly, on the other hand, would not overrule such a decision unless the earlier Court was not merely in error, but "drastically" in error, or had rendered a decision that was nonsensical. If so, then Justice Kelly would examine customs and unforeseen practices to determine if overruling was appropriate.

She claims, correctly we acknowledge, that her approach, as contrasted with the *Robinson* approach, would likely produce fewer cases overruling precedent. Yet, is that the proper

29

measure of the merits of these two approaches?  We think not.

We  think not because the proper measure of  tests of stare decisis is not whether one approach reverses more than another, but rather which approach  is more consistent with American constitutionalism.  We believe  the constitutional arrangement in our state and nation reposes in the legislative body the role of making public policy.  That arrangement is distorted when the judiciary misconstrues statutes.  The majority's view is that its approach to stare decisis, in overruling our prior erroneous interpretations of statutes, respects the democratic process by yielding to the constitutional authority of the Legislature its right to establish the state's policy.

Justice Kelly's approach is flawed because it gives  the earlier Court and its judges far too much power—power  beyond that which the constitution gave them.  Nothing is clearer under our constitution than that the Legislature, when it has enacted a statute within its constitutional authority and, thus, has established public policy, must be obeyed even by the courts.  Said more plainly, the difference in these approaches is that Justice Kelly feels less obligation to adhere to the direction of the people's representatives in the Legislature, and more obligation to defend past judges' errors. We respectfully believe that this approach of Justice

Kelly misunderstands who governs in a republic.  It is not judges; rather, it is the people.  In this case, we have restored the law to what was enacted by the people's representatives.  It is our duty to do so.

As to Justice Cavanagh's criticism of our response to Justice Kelly, it is important that the reader understand that, in the ordinary course of things on an appellate court, majority opinions are written and then dissents follow.  The majority then responds to the dissent.  In the instant case, this was the pattern of things.  To fully argue the approaches of *Robinson* and Justice Kelly is not unseemly nor does it indicate a "manic sensitivity to criticism."  Rather, to respond fully to a dissent indicates that the majority is sufficiently respectful of the dissent, and those who could be persuaded by it, to want to ensure that the issue is fully understood.  Justice Cavanagh, on the occasions when he writes for the majority in the face of dissent, does no less—nor should he.[17]  We claim the same prerogative when he is not in

---

[17] The examples are many, but, to just take one from this term on the topic of departure from precedent, Justice Cavanagh authored the majority opinion in *Allstate Ins Co v McCarn,* 466 Mich 277, 284-291; 645 NW2d 20 (2002), in which I joined, and chose to respond, strongly, to the dissent.

Lest there be confusion that only Justice Cavanagh and I respond to dissents, see Justice Kelly's defense of her majority in *People v Randolph,* 466 Mich ___; ___ NW2d ___ (2002).  The truth is it is quite unusual for justices not to
(continued...)

31

the majority.

On the merits of this case, that is whether *Haske* was wrong, we consider Justice Kelly's critique of the majority opinion to be highly unconvincing. Contrary to the dissent's position, there obviously is a distinction between "wages earned" and "wage earning capacity." See slip op at 5-6. It is simply inaccurate to state that "capacity to earn wages and wages earned will rarely differ." Slip op at 5. On the contrary, it can clearly be the case that an individual might earn wages below his wage earning capacity. With regard to the second sentence of § 301(4), which establishes that disability does not create a presumption of wage loss, one likely explanation for this sentence is the provision of reasonable employment with full wages to an injured employee despite a reduction in wage earning capacity. That is, a person might suffer a disability under § 301(4), i.e., a reduction in wage earning capacity in work suitable to his qualifications and training, because of an inability to actually earn wages in the ordinary job market, but be paid full wages by an employer for the performance of reasonable employment. In such a situation, the employee would be "disabled," but not suffer wage loss.

_____

[17](...continued)
respond to dissents.

We are frankly at a loss to understand the distinction that Justice Kelly would draw between "wage earning capacity" and "earning capacity." Slip op at 7. An employee earns wages for his work. We cannot see any sensible distinction between "wage earning" and "earning" in the present context, let alone what difference such a distinction makes to the practical application of the definition of "disability" in § 301(4). Similarly, we do not see the point of somehow attempting to equate the phrase "wage earner," which refers to a person, with the phrase "wage earning," which is used in § 301(4) as an adjectival phrase to modify the term "capacity" for the purpose of effectively concluding that disability requires a showing of only an inability to perform one particular job suitable to a person's qualifications and training. *Id.*

We emphatically disagree with Justice Kelly's statement that "the proper definition of disability focuses on a limitation in the capacity to perform the work, not on a limitation in the capacity to earn wages . . . ." Slip op at 8 (emphases removed). While that might be a definition she would prefer, the plain language of § 301(4) defines "disability" as, in pertinent part, "a limitation of an employee's *wage earning capacity* in work suitable to his or her qualifications and training" (emphasis added). Thus, a

33

judicial "definition" of disability, such as the one in *Haske,* that does not focus on the employee's capacity to earn wages, i.e., the employee's wage earning capacity, is simply inconsistent with the plain language of the controlling statute.

                                    VII

For these reasons, we overrule the *Haske* definition of "disability" as that term is used in MCL 418.301(4). Accordingly, we vacate the judgment of the Court of Appeals and remand this case to the WCAC for reconsideration consistent with this opinion.

**STATE OF MICHIGAN**

**SUPREME COURT**

CHARLES SINGTON,

     Plaintiff-Appellee,

v                                       No. 119291

CHRYSLER CORPORATION, also known
as DAIMLERCHRYSLER CORPORATION,

     Defendant-Appellant.

_____

WEAVER, J. (*concurring*).

The dissents and the majority have chosen to engage in responses to each other that contain some inappropriate and unnecessary assertions. For this reason, and to emphasize this Court's treatment of the worker's compensation act's definition of disability since the Legislature amended the definition to its current form in 1987, I write separately.

I concur with the result and the reasoning of parts one through five of the majority opinion. The majority decision is consistent with my partial concurrence and partial dissent in *Haske v Transport Leasing, Inc,* 455 Mich 628; 566 NW2d 896

(1997),[1] and follows consistently from this Court's interpretations of the definition of disability under the WDCA that preceded *Haske*. See, *e.g., Rea v Regency Olds,* 450 Mich 1201; 536 NW2d 542 (1995), and *Michales v Morton Salt Co*, 450 Mich 479; 538 NW2d 11 (1995).[2]

MCL 418.301(4) as amended in 1987 states:

> As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease.  The establishment of disability does not create a presumption of wage loss.

Addressing this language for the first time at this level, the *Rea* Court stated as follows:

> A majority of the Court is of the opinion that the 1987 definition of disability in the Worker's Disability Compensation Act requires a claimant to demonstrate how a physical limitation affects wage-earning capacity in work suitable to the claimant's qualifications and training.  It is not enough for the claimant claiming partial disability to show an inability to return to the same or similar work. If the claimant's physical limitation does not affect the ability to earn wages in work in which the claimant is qualified and trained, the claimant is not disabled. [*Id*. at 1201.]

---

[1]  The *Haske* decision was decided by a four to two to one split.

[2] I joined the dissent in *Rea* because I agreed with Justice Riley that the *Rea* majority unnecessarily remanded in that case for further factfinding.  I joined the majority in *Michales.*

2

Addressing the same language as it appears at MCL 418.401(1),[3] the *Michales* decision noted the language's focus is on wage-earning capacity:

> The relevant inquiry is not whether there is a theoretical job in the employee's general field of employment that the employee is no longer able to perform. Instead, the question is whether the employee's wage-earning capacity, i.e., ability to earn wages, has been limited, considering the employee's qualifications and training. [*Id.* at 493, n 19.][4]

The majority decision in *Haske* abruptly broke from these prior interpretations of the WDCA definitions of disability. It held that "an employee is disabled if there is at least a single job within his qualifications and training that he can no longer perform." *Haske,* p 662.

The problem with the *Haske* majority's holding is that, as I noted in my opinion, it returned disability analysis to its pre-1981 and 1987 state rendering the Legislature's amendments in those years meaningless. See, e.g.*, Powell v Casco Nelmor Corp,* 406 Mich 332, 350; 279 NW2d 769 (1979)(holding that

---

[3] Subsection 401(1) is part of Chapter 4 of the worker's compensation act addressing occupational diseases.

[4] In his *Michales* concurrence, Justice Cavanagh summarized the statute's focus on wage-earning capacity:

> [B]oth an injury and a limitation in wage-earning capacity must be shown. A complete failure to introduce any evidence of a limitation in wage-earning capacity resulting from the injury simply precludes an award of benefits as a matter of law. [*Id.* at 496.]

disability is the inability to perform work the claimant was doing when injured), and *Pique v General Motors Corp*, 317 Mich 311, 315; 26 NW2d 900 (1947)(finding total disability where an employee was unable to do the same work after the injury).

# STATE OF MICHIGAN

## SUPREME COURT

CHARLES SINGTON,

    Plaintiff-Appellee,

v                                                                    No. 119291

CHRYSLER CORPORATION, also known as
DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I agree with the majority regarding the continuing viability of *Powell v Casco Nelmor Corp*, 406 Mich 332; 279 NW2d 769 (1979). I further agree with the majority that the Court of Appeals erroneously substituted MCL 418.301(9)'s reasonable employment definition for MCL 418.301(4)'s disability requirement. However, I write separately because I disagree with the majority's decision to overrule *Haske v Transport Leasing, Inc*, 455 Mich 628; 566 NW2d 896 (1997).

The *Haske* Court found that the first sentence of MCL 418.301(4) was ambiguous, and examined the law and the

Legislature's changes to resolve this ambiguity. *Haske* at 643-653. After such examination, the Court determined that the Legislature must have intended to adopt the definition of disability that "an employee is disabled whenever he can no longer perform a job suitable to his qualifications and training as a result of his injury." *Id.* at 655. The Court reasoned:

> Subsection 301(4) . . . requires the employee to prove a disability, i.e., that he is eligible for compensation, and then prove wage loss, i.e., that he is entitled to an award. This language codifies the prior approach in Michigan that injury is not compensable without wage loss. If the employee establishes a disability, he must further prove a wage loss because wage loss will not be presumed. See subsection 301(4). However, *in order to prove a wage loss*, under the language of the statute and on the basis of our longstanding interpretation of related precedent, most recently confirmed in *Sobotka* [*v Chrysler Corp (After Remand)*, 447 Mich 1, 17; 523 NW2d 454 (1994) (Boyle, J., lead opinion)], the employee must establish *a reduction in earning capacity*.

> With this conclusion, the definition of disability in subsection 301(4) cannot then be logically interpreted as a reduction of wage-earning capacity as long as wage loss is also measured by a reduction in wage-earning capacity. See *Lawrence v Toys R Us*, 453 Mich 112, 121; 551 NW2d 155 (1996) (Levin, J., plurality opinion). Subsection 301(4)'s second sentence eliminates the possibility that disability and wage loss are defined the same way when it provides that proof of a "disability does not create [a] presumption of wage loss." [*Haske* at 654-655 (emphasis in original).]

Because I remain committed to the Court's decision in *Haske*, I respectfully dissent from the majority's decision to

2

overrule *Haske*.

I also must express my disappointment with the majority's lengthy response to Justice Kelly's dissenting opinion. I appreciate that my colleagues feel the need to defend and substantiate their respective positions, after all, that is our duty as justices. However, I am uncomfortable with the majority's overzealous attack of Justice Kelly's discussion of stare decisis. It is completely unnecessary to add numerous pages defending the majority's decision to overrule precedent and attacking Justice Kelly's positions in previous cases. These lengthy sections have nothing to do with the merits of this case and do not add anything to the resolution of the question at hand. They do, however, speak volumes about the majority's manic sensitivity to criticism.

S T A T E   O F   M I C H I G A N

SUPREME COURT


CHARLES SINGTON,

    Plaintiff-Appellee,

v                                     No. 119291

CHRYSLER CORPORATION, also known
as DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I join Justice Cavanagh dissenting in the overruling of *Haske v Transport Leasing, Inc.*[1] I write separately to point out that the majority's pronouncement on the respect to be accorded the precedent of this Court is at best misleading.

    I.  The Majority Again Disdains Precedent

Today the majority once again discards a prior decision

_____

[1]455 Mich 628; 566 NW2d 896 (1997). The Michigan Reports erroneously failed to show me as "not participating" in the companion case to *Haske*. To correct that, I should be listed as not participating in *Bailey v Leoni Twp (After Remand)* decided *sub nom Haske v Transport Leasing, Inc.*

and replaces it with its preferred interpretation of the law.[2] In announcing its new vision of disability law, it refers to its recent pronouncements about the value of precedent in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), and *Robertson v DaimlerChrysler*, 465 Mich 732; 641 NW2d 567 (2002). However, the sheer volume of this majority's decisions overturning precedent in the past four years raises serious questions about the degree to which the majority values the principle of stare decisis. Time after time, established law has been discarded on the basis that it was "wrongly decided."[3] It is an amazement to me how frequently the members of this majority have found that esteemed justices

---

[2]See, e.g., *People v Hardiman*, 466 Mich 417; ___ NW2d ___ (2002); *People v Cornell*, 466 Mich 335; ___ NW2d ___ (2002); *Koontz v Ameritech Services, Inc*, 466 Mich 304; 645 NW2d 34 (2002); *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002); *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002); *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492; 638 NW2d 396 (2002); *Brown v Genesee Co Bd of Comm'rs*, 464 Mich 430; 628 NW2d 471 (2001); *People v Glass*, 464 Mich 266; 627 NW2d 261 (2001); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143; 615 NW2d 702 (2000); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000); *Stitt v Holland Abundant Life Fellowship,* 462 Mich 591; 614 NW2d 88 (2000); *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000); *People v Kazmierczak*, 461 Mich 411; 605 NW2d 667 (2000); *McDougall v Schanz*, 461 Mich 15; 597 NW2d 148 (1999); *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999); *Ritchie-Gamester v Berkley*, 461 Mich 73; 597 NW2d 517 (1999). This listing is intended to be representative, not exhaustive.

[3]**See, e.g.,** *Robertson, supra* at 758; *Pohutski* at 694; *Nawrocki,* at 180; *Mudel, supra* at 713; *Robinson, supra* at 464-465; *Kazmierczak, supra* at 425.

who came before them simply misunderstood the law.[4]

In the five-year period from 1993 through 1997, there were approximately twelve cases in which precedent was overturned by this Court.[5]  In the five-year period from 1998 through 2002, at least twenty-two cases were overturned.[6]

---

[4]In most of the cases in footnote 2, the majority overruled precedent because of its disagreement with earlier Courts' interpretations of statutory or constitutional principles.  See, e.g., *Cornell, supra; Koontz, supra; Robertson, supra; Pohutski, supra; Glass, supra; Nawrocki, supra; Brown, supra; Mudel, supra; Lukity, supra; Kazmierczak, supra; McDougall, supra.*  In only two of them does the majority believe that precedent was rendered obsolete by the evolution of the law.  *Hardiman, supra; Robinson, supra.*  In others, it does not even acknowledge that precedent is being overturned, although the dissent points it out.  *Hanson, supra; Ritchie-Gamester, supra.*

[5]*Bradley v Saranac Comm Schs Bd of Ed*, 455 Mich 285; 565 NW2d 650 (1997); *People v Bailey*, 451 Mich 657; 549 NW2d 325 (1996); *W T Andrew Co Inc v Mid-State Surety Corp*, 450 Mich 655; 545 NW2d 351 (1996); *Corl v Huron Castings, Inc*, 450 Mich 620; 544 NW2d 278 (1996); *People v Wood*, 450 Mich 399; 538 NW2d 351 (1995); *Sokolek v General Motors Corp*, 450 Mich 133; 538 NW2d 369 (1995); *People v Kevorkian*, 447 Mich 436; 527 NW2d 714 (1994); *Jennings v Southwood*, 446 Mich 125; 521 NW2d 230 (1994); *People v Vandervliet*, 444 Mich 52; 508 NW2d 114 (1993); *Auto Club Ins Ass'n v Frederick & Herrud, Inc*, 443 Mich 358; 505 NW2d 820 (1993); *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993); *People v Fisher*, 442 Mich 560; 503 NW2d 50 (1993).

[6]*Sington, Hardiman, supra; Cornell, supra; Koontz, supra; Robertson, supra; Pohutski, supra; Hanson, supra; Brown, supra; Glass, supra; Nawrocki , supra; Mudel , supra; Stitt , supra; Robinson , supra; Kazmierczak, supra; McDougall, supra; Lukity, supra; Ritchie-Gamester, supra; People v Graves*, 458 Mich 476; 581 NW2d 229 (1998); *McKenzie v Auto Club Ins Ass'n*, 458 Mich 214; 580 NW2d 424 (1998); *People v Kaufman*, 457 Mich 266; 577 NW2d 466 (1998); *AFSCME v Highland Park Bd of Ed*, 457 Mich 74, 577 NW2d 79 (1998); *People v Lemmon*, 456 Mich 625;

(continued...)

However, the number of dispositions went down.[7]

The test for overturning precedent articulated in *Robinson*, and again in *Robertson* includes two prongs: The first is whether the earlier decision was wrongly decided. The majority has ruled *Haske* was wrongly decided.[8]

---

(...continued)
576 NW2d 129 (1998).

[7]According to the clerk's office, the Court disposed of 13,682 cases between 1993 and 1997. Between 1998 and June 30, 2002, it disposed of 11,190 cases.

[8]The simplicity of this prong as stated in *Robinson* and applied to legislative interpretation gives rise to a large part of the differences between the majority and myself. It appears that the majority believes itself gifted with prodigious and unprecedented insight into the mind of the Legislature. The recent sharp increase in reversals of precedent is alarming because it suggests that this majority believes that only it, not present dissenters nor many past majorities of this Court, can discern the true intent of the Legislature.

It is not, as the majority alleges here, a matter of my not understanding "who governs in a republic." Nor is it a matter of defending "past judges' errors" or feeling less obligation than they to "adhere to the direction of the people's representatives . . . ." Slip op at 32. Rather, it is a matter of exercising judicial restraint and of avoiding concluding too easily that other experienced justices wrongly interpreted legislation. It is a matter of not falling prey to a zealot's conviction that what has been done in the past by others has been simply wrong.

Stare decisis is not an argument intended to resuscitate the dead hand of the judiciary. Adherence to it contributes to, not detracts from, the integrity of our constitutional system. As Justice Marshall once pointed out:

That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our

(continued...)

4

The second *Robinson* prong is whether overruling the precedent of this Court would work an undue hardship on the basis of reliance interests. In considering that question, the majority labels a worker's reliance on a disability determination under *Haske* an illegitimate and insignificant expectation. Slip op at 23. It has apparently decided that the *Haske* decision strayed so far into error that no one should ever have relied on it. It seems to assume that even those having no legal education can and do distinguish between which court precedent should be followed and which should not.

Contrary to the majority's assertions, I do not consider stare decisis a conclusive barrier to change. The majority's effort challenging me to explain some disagreement with *Robinson* would be better spent explaining the facility with which it excuses itself from exercising the judicial restraint *Robinson* embraces.

Stare decisis has long been venerated in the law and with good reason. Adherence to this doctrine promotes the evenhanded, predictable, and consistent development of legal principles and contributes to the integrity of the judicial process, both actual and perceived. *Robinson, supra* at 463,

_____

[8](...continued)
constitutional system of government, both in appearance and in fact. [*Vasquez v Hillery*, 474 US 254, 265-266; 106 S Ct 617; 88 L Ed 2d 598 (1986).]

5

n 21, citing *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). It is a bedrock principle. When a Court pays no more than lip service to it, the basic integrity of the legal system itself is shaken.

II. *Haske* was not wrongly decided.

*Haske* was correctly decided. The definition of disability that it adopted is supported by the fact that the statute treats "disability" and "wage loss" as separate concepts. Examining the language of MCL 418.301(4), one finds that the first sentence defines disability. The second makes clear that it cannot be presumed that one has suffered a wage loss merely because one has become disabled. Of course, that is because one may be disabled but not suffer a wage loss, hence, not be qualified for benefits.

The majority's new definition of disability is: an incapacity after work-related injury or illness to earn maximum wages in work for which the claimant is qualified and trained. As a practical matter, this definition means disability is an incapacity after work-related injury or illness *to earn the same or greater wages* in work for which the claimant is qualified and trained.

The starting point in analyzing this is the statutory expression "wage earning capacity." The majority attempts to convince that a distinction exists between "wages earned" and

6

"wage earning capacity."  In truth, capacity to earn wages and wages earned will rarely differ.  This is illustrated by the fact that, when applying its definition to Charles Sington, the majority assumes they are the same.  Slip op at 24.  Also, it cites with approval Justice Weaver's words:  "the most basic interpretation of 'wage earning capacity' is that it describes an employee's ability to earn wages."  Slip op at 18.

The majority provides no persuasive examples how it could be that an employee would be earning at under capacity if not disabled.  By definition, normally, what the employee earns is what the job will pay at any given time.  Hence, "wage earning capacity" and "wages earned" are, practically speaking, synonymous. It follows, then, that as the majority reads it, the first sentence in § 301(4) contradicts the second.  It reads:  "The establishment of disability does not create a presumption of wage loss."

If one must prove a wage loss to make out a disability, the second sentence of § 301(4) is rendered nugatory.  If one cannot be disabled absent a wage loss, the establishment of a disability relies on a wage loss.  The majority confirms this by quoting with approval from *Pulley* to the effect that "the wages earned" are one of the "complex of fact issues" used to determine wage earning capacity.  Slip op at 16.  *Pulley v*

*Detroit Engineering & Machine Co*, 378 Mich 418, 423; 145 NW2d 40 (1966). Of course, *Haske* disagreed with *Pulley*.

The *Haske* decision is based on the proposition that § 301(4), properly defined, treats "disability" and "wage loss" as distinct concepts. Defining a disability as the majority does, as a loss of capacity to earn maximum wages in one's field, when there can be no presumption of a wage loss in the definition, is nonsense.

The majority has defined "earning capacity" using a rigid textualist approach to statutory interpretation (and, as I have pointed out, it makes no meaningful distinction from "wages earned"). However, the statutory expression is not "earning capacity." Rather, it is "wage earning capacity."

A plain meaning interpretation of that expression is that "wage earning" is an expression akin to "wage earner," which is defined as "a person who works for wages." *Random House Webster's College Dictionary* (1995). Hence "wage earning capacity" means "the capacity of a person who works for wages." Using that, the proper interpretation of the first sentence of § 301(4) becomes "disability is a limitation after work-related injury or illness in the capacity of a person who works for wages in work for which the person is qualified and trained." Then, the second sentence of §301(4), "[t]he establishment of disability does not create a presumption of

8

wage loss," is not rendered nugatory or contradictory. Also, the holding in *Haske* is shown to be correct. See *Haske* at 653-654 and slip op at 2 (Cavanagh, J.).

Even if "wage earning capacity" were defined as if it read "earning capacity," the majority's definition is off the mark. Black's Law Dictionary (6th ed) defines "earning capacity," inter alia, as the "Fitness, readiness and willingness to work, considered in connection with opportunity to work." The emphasis is on capacity to perform the work. Using that, the proper interpretation of the first sentence of § 301(4) becomes "disability is a limitation after work-related injury or illness in the fitness of an employee to work for wages in work for which the person is qualified and trained." As with my earlier analysis, the proper definition of disability focuses on *a limitation in the capacity to perform the work*, not on *a limitation in the capacity to earn wages,* as the majority insists.

The majority's opinion is a study in confusion in other respects, in addition to its reading of § 301(4). For example, it correctly recognizes that a prerequisite to being considered a participant in reasonable employment under MCL 418.301(5) is a determination that the employee has suffered a disability under § 301(4). Slip op at 5-6. However, later it states that, in order to determine whether plaintiff was

9

disabled after his left shoulder injury and before his stroke, the WCAC must inquire whether the work he was doing then was reasonable employment. Slip op at 24.

It concludes, "if defendant . . . would not have accommodated plaintiff's injury, except for it being work related, that would be indicative of a limitation in wage earning capacity." Slip op at 25, n 14. Hence, the fact that the employee obtained reasonable employment under § 301(5) is a factor to be used to determine if the employee was disabled.

### III. Conclusion

The majority's reading of MCL 418.301(4) is incorrect. It creates contradictions between the definition of disability and other parts of the statute. Also, the majority opinion is internally contradictory.

*Haske* accurately interpreted the statute. The majority's rationale for overturning it gives no deference to precedent. It simply replaces its interpretation of the first sentence of § 301(4) with the interpretation of a different group of justices.

Appellate courts, in the normal course of their work, are called upon continuously to reevaluate the lasting vigor of prior courts' binding opinions. Of necessity, some must be found to be no longer valid because of subsequent legislative alterations of the law or changing customs and practices

10

unforeseen by an earlier court.  Very occasionally, a prior decision is found to work unexpected hardship.  And rarely, a drastic error may be shown to have been made by a prior court in its reasoning or reading of a statute.[9]

So it is that, in the history of this and of the vast majority of supreme courts across the land, overrulings of precedent are infrequent.  Yet, quite the opposite is true of the present Michigan Supreme Court.  It is for that reason that, the majority's pronouncements to the contrary notwithstanding, one may wonder whether reasoned adherence to stare decisis may properly be considered a policy of this Court.

The decision of the Court of Appeals should be affirmed.

---

[9]For instance, in *Lesner v Liquid Disposal, Inc,* 466 Mich 95; 643 NW2d 553 (2002), I found, as did the majority, that it was necessary to overrule *Weems v Chrysler*, 448 Mich 679; 533 NW2d 287 (1995).  This is because *Weems* provided a formula for the calculation of death benefits that was utterly nonsensical when multiple partial dependents were considered.